**Slip Op. 00-159**

## UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                  :

TOY BIZ, INC.,
                                  :

              *Plaintiff,*
                                  :

             v.
                                  :       Court No. 96-10-02291

                                  :

UNITED STATES,
                                  :

             *Defendant.*
                                  :
_____ :

[Parties' cross-motions for summary judgment on issue of classification of action figures as dolls versus toys are denied.]

Dated: November 28, 2000

Singer and Singh (Sherry L. Singer and Indie K. Singh), for Plaintiff.

David W. Ogden, Assistant Attorney General; Joseph I. Liebman, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice; Mikki Graves Walser, Attorney, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice; Beth C. Brotman, Office of Assistant Chief Counsel, International Trade Litigation, United States Customs Service, of counsel; for Defendant.

**OPINION**

RIDGWAY, Judge:

The X-Men have been the stars of Marvel Comics for decades, weaving complex plotlines with powerful allegories about race, alienation, and individuality. A cross-over hit as a TV series (premiering initially in 1992), this summer the X-Men stormed a new battlefield -- the box office.

"X-Men the Movie" brought the comic book mutants to life on the silver screen in July 2000,

packing theatres across the country and emerging as one of the biggest sci-fi blockbusters ever.

This case concerns the classification of certain X-Men and other Marvel action figures and

dolls imported by Plaintiff, Toy Biz.  The merchandise, imported from China through the ports of

Seattle and Los Angles in 1993 and 1994, includes approximately 90 action figures from various

Marvel Comics series (including the X-Men, Spider-Man, and the Fabulous Four), as well as a doll

sold as "Jumpsie."[1]

This case has been designated a test case pursuant to USCIT Rule 84, and is before the Court

on cross-motions for summary judgment filed under USCIT Rule 56 by Toy Biz and Defendant, the

United States ("the Government").

Background

The U.S. Customs Service classified the merchandise at issue under subheading 9502.10.40

of the Harmonized Tariff Schedule of the United States ("HTSUS"),[2] as "[d]olls representing only

---

[1] In light of the large number of items at issue, and the numerous errors and discrepancies in the parties' submissions, the parties entered into a Stipulation (listing all items in dispute in this action, and superceding all their prior statements on the subject).  The Stipulation is annotated to reflect the parties' agreement – reached in their October 13, 2000 conference with the Court – as to the evidence (samples, photographs and catalogs) to be considered in ruling on the pending motions for summary judgment.  *See* Stipulation (dated October 18, 2000; submitted under cover of Defendant's Consent Motion To File Its Response To Plaintiff's Complaint Out of Time [sic; Consent Motion To File Stipulation Out of Time] and docketed October 19, 2000 ).  On October 20, 2000, Toy Biz submitted additional samples (the existence of which are not reflected in the Stipulation).  *See* Notice from Counsel for Toy Biz (Oct. 20, 2000) (listing samples submitted).  *See also* Letter from Counsel for Toy Biz (Oct. 23, 2000) (Stipulation references to "Robin Wolverine" should read "Robot Wolverine").

[2] 19 U.S.C. § 1202 (1994).

human beings and parts and accessories thereof," dutiable at 12% ad valorem.[3] Toy Biz contests that classification, pointing to the action figures' various "non-human physical characteristics, e.g. robotic limbs, tentacles, wings or silver metallic skin." Memorandum in Support of Plaintiff's Motion for Summary Judgment ("Plaintiff's Memo") at 2. For that reason, among others, Toy Biz contends that the action figures and the related items packaged with many of them should be classified not as dolls, but instead as toys or toy sets under various subheadings of HTSUS Chapter 9503 (dutiable at 6.8% ad valorem). Similarly, Toy Biz argues that Jumpsie should be classified as a "toy set" under HTSUS subheading 9503.70.80 (also dutiable at 6.8%), because – according to Toy Biz – the items packaged with the doll are not "accessories" within the meaning of HTSUS heading 9502.

Most of the action figures here at issue are poseable five- and ten-inch brightly-colored plastic figures.[4] "Silver Samurai" is a poseable five-inch plastic figure clad in silver metallic armor. "Silver Surfer" is a poseable five-inch metallic silver plastic figure, packaged with a metallic silver plastic surfboard. Many of the other figures are also packaged with weapons and other battle gear,

---

[3]In its entirety, HTSUS subheading 9502.10.40 reads: "Dolls representing only human beings and parts and accessories thereof: Dolls whether or not dressed: Other: Not over 33 cm in height."

In addition, Customs separately classified the trading cards included with certain of the action figures under HTSUS subheading 4911.99.60, "Other printed matter, including printed pictures and photographs: Other: Other: Other: Printed on paper in whole or in part by a lithographic process," dutiable at 0.4% ad valorem. Toy Biz contends that trading cards instead should be classified – together with the action figures and any weapons and equipment with which they are packaged – as toy sets under HTSUS subheading 9503.70.80. Toy Biz argues in the alternative that, if the trading cards are classified separately from the action figures, the weapons and equipment must be classified separately as well (under HTSUS subheading 9503.90.60).

[4]The stated heights of all figures are approximations.

equipment and/or trading cards.[5]  All have heads, torsos, arms and – with the possible exception of "Bonebreaker" and "Professor X" – legs.[6]

The figures sold as "Projectors" are colorful, poseable seven-and-one-half inch plastic figures, with miniature slide projectors in their chest cavities.  The "Steel Mutants" are colorful two-and-three-quarters inch poseable figures made of die-cast metal, sold in pairs of two (an X-Men hero coupled with one of the hero's arch-enemies).

"Jumpsie" – the only item at issue which is not an action figure  –  is a 10 ½ -inch battery-operated plastic doll representing a young girl, which is packaged with two small pompoms, a small styling comb, and a toy trampoline (all for the doll).  When placed on the toy trampoline and switched on, the doll appears to jump on its own.

<u>Jurisdiction and Standard of Review</u>

Jurisdiction is predicated on 28 U.S.C. § 1581(a) (1994).  Customs' classification decisions are subject to *de novo* review pursuant to 28 U.S.C. § 2640 (1994).

---

[5]Pending before the Court is Defendant's Motion *In Limine*, seeking to, *inter alia*, strike Toy Biz's arguments relating to trading cards (except as to Assortment Nos. 4900 I, 4900 J, and 4950 F). In addition, the Motion *In Limine* seeks to prohibit Toy Biz from introducing evidence concerning three assortments of action figures, and to sever and dismiss the action as it relates to those assortments.  This decision does not dispose of that motion.

[6]Examination of the samples provided reveals that Professor X is seated in what appears to be a wheelchair (but is described as a "hover-unit"), with what appears to be a blanket covering his lap, and a section of the vehicle covering his lower legs (or where his lower legs should be).  *See, e.g.,* Toy Biz 1994 Catalog at 5 (depicting and describing Professor X's "uniquely designed hover-unit").  Similarly, Bonebreaker's upper torso protrudes from a tank; his legs (if he has them) are not visible.  The parties' positions on the existence of lower appendages are not entirely clear.

Under USCIT Rule 56(c), summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See* Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Int'l Trading Co. v. United States, 24 CIT ____, ____, 110 F. Supp. 2d 977, 981 (2000). Summary judgment is a favored procedural device "to secure the just, speedy and inexpensive determination of every action." Celotex, 477 U.S. at 327 (*quoting* Fed. R. Civ. P. 1); Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562 (Fed. Cir. 1987).

But "summary proceedings are not intended to substitute for trial when it is indeed necessary to find material facts." Scripps Clinic & Research Found. v. Genentech, Inc., 927 F.2d 1565, 1570 (Fed. Cir. 1991) (*citing* Meyers v. Brooks Shoe, Inc., 912 F.2d 1459, 1461 (Fed. Cir. 1990)). Thus, it remains a function of the court to "determine whether there are any factual disputes that are material to the resolution of the action. The court may not resolve or try factual issues on a motion for summary judgment." Sea-Land Service, Inc. v. United States, 23 CIT ____, ____, 69 F. Supp. 2d 1371, 1375 (1999) (*quoting* Phone-Mate, Inc. v. United States, 12 CIT 575, 577, 690 F. Supp. 1048, 1050 (1988)). *See also* Anderson, 477 U.S. at 249 ("the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial"). Accordingly, the court must deny summary judgment where there is a "dispute about a fact such that a reasonable trier of fact could return a verdict against the movant." Ugg Int'l, Inc. v. United States, 17 CIT 79, 83, 813 F. Supp. 848, 852 (1993); Pfaff Am. Sales Corp. v. United States, 16 CIT 1073, 1075 (1992).

Discussion

Customs classified all items at issue in this case as "[d]olls representing only human beings," under HTSUS heading 9502. Toy Biz's threshold – and primary – contention is that all items other than Jumpsie (that is, all the action figures) instead should be classified under subheading 9503.49.00, as "[t]oys representing animals or non-human creatures (for example, robots and monsters)."[7]

The Government argues that HTSUS heading 9502 is an *eo nomine* provision for "dolls," encompassing all forms of the article. Memorandum in Support of Defendant's Motion to Dismiss and In Opposition to Plaintiff's Motion for Summary Judgment and In Support of Defendant's Cross-Motion for Summary Judgment ("Defendant's Memo") at 18-19. According to the Government, lexicographic authorities and case law have defined "doll" broadly, and courts have recognized that dolls need not include all the anatomical elements of a real person, and may include additional characters or things. *Id*. at 19-21. The Government emphasizes the human-ness of the action figures here:

> [A]ll of the imported action figures are representations of human beings with such features as a head, mouth, eyes, nose, hair, arms, torso, breasts, muscles, and (with [the exception of two figures, featured in what appears to be an electronic wheelchair and a tank] . . .) legs and feet. All of the action figures are noticeably lifelike and constructed in a manner which permits an impressive range of human-like movement . . . . [T]he imported action figures are dressed as human beings and equipped with weapons and accessories in a manner associated with actual or fictional warfare. . . . [T]hese action figures are further representative of such human characteristics as gender, race, physical impediment/handicap, and nationality.

---

[7]In its entirety, HTSUS subheading 9503.49.00 reads: "Other toys; reduced-size ("scale") models and similar recreational models, working or not; puzzles of all kinds; parts and accessories thereof: Toys representing animals or non-human creatures (for example, robots and monsters) and parts and accessories thereof: Other."

Reply Memorandum to Plaintiff's Opposition to Defendant's Cross-Motion for Summary Judgment

("Defendant's Reply") at 11.

Toy Biz accuses Customs of using the wrong test to classify the action figures at issue.  Toy

Biz asserts that Customs acknowledged that many of the figures have "mutant features," but based

its classification decision on its conclusion that the "overall physical characteristics [of the figures]

are representative of human beings."  Plaintiff's Memo at 7, *quoting* Defendant's Response to

Plaintiff's First Set of Interrogatories.  Toy Biz argues that, while Customs' test may have been

appropriate under the Tariff Schedules of the United States ("TSUS"), it is wrong under the HTSUS.

According to Toy Biz:

> The tariff classification of figures with both human and non-human features shifted
> [when the HTSUS replaced the TSUS].  Under the TSUS, such figures were
> classified as dolls *unless they were predominantly non-human in nature*.  The
> HTSUS reversed this: under the HTSUS, figures possessing both human and non-
> human characteristics are classified under the provision for toys, *even when the
> figures have predominantly human characteristics*.

Memorandum of Plaintiff In Reply to Defendant's Memorandum in Opposition to Plaintiff's Motion

for Summary Judgment and in Opposition to Defendant's Cross-Motion for Summary Judgment

("Plaintiff's Reply") at 8.  Thus, Toy Biz contends that "hybrid" figures – that is, figures with both

human and non-human features – are "toys" under the HTSUS:

> The Explanatory Notes are unambiguous on this point:   95.03; the heading for toys
> covers: "Toys representing animals or non-human creatures even if possessing
> predominantly human physical characteristics (e.g., angels, robots, devils, monsters)
> . . . ."

*Id.*[8]

---

[8]Because of this asserted difference between the TSUS and the HTSUS, Toy Biz challenges
the Government's reliance on certain cases decided under the TSUS.  Plaintiff's Reply at 9-11.

In short, emphasizing the language of Explanatory Note 95.03(A)(1) -- particularly the phrase "even if possessing predominantly human physical characteristics" -- Toy Biz argues that, under the HTSUS, the test for doll versus toy is not whether a particular figure is more human or more non-human. Rather, according to Toy Biz, a figure with *any* non-human features must be classified as a toy.[9]

The dispositive issue, however, is the *obviousness* of any non-human features.[10]

---

However, this decision does not rest on those cases. Accordingly, there is no need to decide here whether or not, as Toy Biz claims, some figures classifiable as toys under the HTSUS would have been classified as dolls under the TSUS.

[9]Toy Biz emphasizes that Customs' classification of the action figures as dolls in some cases overruled the recommendations of various senior Customs personnel. *See* Plaintiff's Statement of Material Facts, ¶ 13 (Beast); ¶ 19 (Bonebreaker); ¶ 37 (Slayback); ¶¶ 38, 40 (Cable); ¶ 64 (Vulture); Plaintiff's Reply, at 12 n.2 (Beast), 12 n.3 (Cable), 13 n.4 (Vulture), 13 n.5 (Slayback). *But see* Defendant's Reply at 12 n.3 (asserting that the version of Beast here at issue differs from that at issue in the Customs decision that Toy Biz cites; that Customs reevaluated its position and reclassified Cable after the Customs decision that Toy Biz cites; that – unlike the version before the Customs specialist at the time of the decision that Toy Biz cites – the "wings" on the version of Vulture at issue here are "clearly a part of the figure's uniform and not his body"; and that, since 1996, Customs has consistently classified the various versions of Vulture as dolls).

[10]The parties properly focus on the physical characteristics of the figures themselves as the basis for their classification. Customs generally classifies a figure as a toy only if its physical characteristics identify it as non-human "without the necessity of viewing a particular movie or knowing a particular storyline." *See, e.g.,* HQ 950200 (Dec. 18, 1991). However, there is an "established popular culture" exception to that rule. Where a figure is widely recognized or established in popular culture as a non-human creature, Customs considers that fact to be "some indicia" of the figure's classification as a non-human creature, as opposed to a doll. HQ 952821 (Mar. 3, 1993).

Here, even if the storylines of the action figures at issue were deemed to be sufficiently established in mass popular culture to allow Toy Biz to invoke the popular culture exception (a doubtful proposition), there is no indication that Toy Biz's cause would be advanced. For example, the X-Men characters are "mutants." As the Government has observed, Toy Biz's 1992 catalog described mutants as "*people* born with 'x-tra' power and abilities beyond those of *ordinary humans*." Defendant's Reply at 11-12, Exh. 4 (emphasis supplied). Knowledge of the X-Men

Customs cannot reasonably be required to closely scrutinize every detail of every figure in a search for non-human features, in order to classify the figure as a doll or a toy. Nor can Customs reasonably be required to speculate on the human-ness of a particular feature or characteristic. Instead -- as Toy Biz itself recognizes -- the relevant standard is "the casual observer."[11] Thus, if a figure has any feature which is both clearly non-human and readily apparent *to a casual observer*, the figure must be said to represent some non-human creature, rather than a human being.[12] *Cf., e.g.,* Gerstenzang Werner Co. v. United States, 21 Cust. Ct. 97, 101, C.D. 1136 (1948) (applying "casual observer" standard in classification of beads).[13]

Like the "reasonable man" standard, the application of the "casual observer" standard -- that is, the determination whether or not a particular feature is (i) readily apparent and (ii) clearly non-human to a casual observer -- presents questions of material fact. Toy Biz has asserted, and the Government has conceded, that various features of a handful of the action figures here at issue are

figures' storyline thus would support their classification as dolls.

[11]*See* Plaintiff's Statement of Material Facts, ¶¶ 14-16 and *passim* (asserting that various allegedly non-human characteristics are "immediately apparent to the casual observer").

[12]Drawing on the history of the language of HTSUS headings 9502 and 9503, Customs routinely applies the "casual observer" standard in determining whether figures should be classified as dolls versus toys. *See, e.g.,* HQ 958242 (Feb. 28, 1996) *quoting* HQ 086088 (Feb. 21, 1990) (apparent intent of international customs committees in classifying angels and devils as toys is "to deny the doll classification to those figures which possess non-human characteristics that are immediately apparent to the casual observer"). Further, Customs has frequently held that the toy classification may be inappropriate where a casual observer would need to "guess as to whether a feature that appears to be non-human is, in actuality, such a feature." *See, e.g., id.*

[13]A figure which is – in the language of Explanatory Note 95.03(A)(1) – "predominantly human," but which has a single *obvious* non-human feature, might well *resemble* a human being but would not *represent* one, and thus would be classified as a toy.

"immediately apparent to a casual observer."[14]   However, even as to those figures, there is no

agreement on whether or not a casual observer would consider the specified features to be "clearly

non-human."[15]   And, as to the rest of the action figures, there is no agreement even as to whether

particular features are "immediately apparent" to a casual observer -- much less agreement on

whether the features are "clearly non-human."

Conclusion

Because genuine issues of material fact are embedded in the application of the "casual

observer" standard to the action figures at issue, and because the parties do not agree on those

---

[14]*See* Plaintiff's Statement of Materials Facts and Defendant's Response thereto at ¶¶ 15 (Trevor Fitzroy/robotic limbs), 16 (Robot Wolverine/robotic limbs, and wiring on torso and face), 25 (Weapon X Wolverine/metallic wiring on limbs and torso, and claws emerging from hands), 26 (Mr. Sinister/black triangle-shaped mark below lips and red diamond-shaped mark on forehead), 41-42 (Grizzly/dark red face, off-white/yellow eyes, and bright orange hair), 44 (Shatterstar/black starburst under left eye), 48 (Silver Surfer/silver bodied figure on silver metallic surfboard), 49 (Terrax/"grey bodied"), 60 (Hobgoblin/red eyes), 63 (Vulture/wings). *See also id.* at ¶ 14 (Plaintiff asserts that Beast has "fangs and fin-like protrusions on its arms and legs" which are immediately apparent to casual observer; Defendant objects as irrelevant, claiming – erroneously – that figure is not at issue, but "to the extent a response may be deemed necessary," admits). *But see* Defendant's Memo at 23 (asserting, contrary to its Response to Plaintiff's Statement of Materials Facts, that none of the action figures at issue have wings).

[15]*See, e.g.,* Defendant's Memo at 23 (minimizing significance of Weapon X Wolverine's claws, disputing that any of the action figures have wings, and contending that Robot Wolverine's robotic arm merely represents "prosthetic or advanced robotic/bionic limb[]" reflective of "human beings of modern and futuristic times." *See also* Defendant's Reply at 12 (asserting that figures may represent human beings notwithstanding "tattoos, odd skin, hair, and eye color, prosthetic limbs (either lifelike or mechanical), intricate headgear, capes resembling wings, [and] uniquely designed weaponry, including claws"); Defendant's Statement of Material Facts at ¶¶ 11-12 (asserting that various versions of Cable represent man with prosthetic arm, and various versions of Wolverine represent man with prosthetic hands).

material facts, summary judgment is not appropriate here.  The parties' cross-motions for summary

judgment on this issue must be denied, and judgment on all other issues is reserved.

A separate order will be entered accordingly.

_____
Delissa A. Ridgway
Judge

Dated:  November 28, 2000
        New York, New York