**SLIP OP. 00 - 86**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

|  |  |  |
|---|---|---|
| MINNETONKA BRANDS, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | Before: WALLACH, Judge |
| v. | : | Court No.: 97-05-00894 |
| | : | |
| | : | |
| THE UNITED STATES, | : | |
| | : | |
| Defendant. | : | |
| | : | |

Decided July 24, 2000

Ross & Hardies (Joseph S. Kaplan); Caramagno & Griffin (William L. Griffin), of counsel, for Plaintiffs.

David W. Ogden, Acting Assistant Attorney General; Joseph I. Liebman, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice (Mikki Graves Walser); Sheryl A. French, Office of Assistant Chief Counsel, United States Customs Service, of counsel, for Defendant.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

INTRODUCTION

Plaintiff, Minnetonka Brands, Inc. ("Minnetonka") is an importer of certain hollow, plastic bodies and heads in the shape of such well-known Sesame Street and Peanuts children's characters as "Big Bird," "Cookie Monster" and "Snoopy Flying Ace." This merchandise, which is used to package and sell bubble bath, was classified by the U.S. Customs Service ("Customs") under Harmonized Tariff Schedule of the United States ("HTSUS") subheadings 3923.30.00 and 3923.50.00. These subheadings, which respectively cover plastic bottles for the conveyance of goods and plastic lids or

caps, carried respective duty rates of 3 % and 5.3 %, <u>ad valorem</u>. Plaintiff claims that the subject merchandise should have been entered duty free under HTSUS subheading 9503.49.00, which covers toys representing animals or non-human creatures.

A bench trial was held on February 23 and 24, 2000. Pursuant to USCIT R. 52(a), the court enters judgment for Plaintiff pursuant to the following Findings of Fact and Conclusions of Law.

FINDINGS OF FACT

1.      This action involves the classification of merchandise contained in two entries (Entry Nos. 3501-96-3264174-5 and 3501-96-3264572-0) which were imported in late 1995. This merchandise was entered at the Port of Minneapolis, Minnesota, and was liquidated in March, 1996.

2.      Each piece of subject merchandise has three components: (1) a blow-molded bottle shaped in the form of a character's body (<u>e.g.</u>, the body of "Big Bird" or "Cookie Monster") which can hold up to 10 ounces of liquid; (2) a bottle cap; and (3) a cap cover in the form of a character's head.

3.      Customs classified the empty bottles imported separately, as well as the complete sets of empty bottles with overcaps, as "[c]arboys, bottles, flasks and similar articles" under HTSUS subheading 3923.30.00 (1995). Imports under this subheading carried a rate of 3 % <u>ad valorem</u>. Bottle caps imported separately were classified by Customs as "[s]toppers, lids, caps and other closures" under subheading 3923.50.00 (1995), dutiable at 5.3 % <u>ad valorem</u>.

4.      In relevant part, HTSUS heading 3923, and subheadings 3923.30.00 and 3923.50.00 cover

> 3923        Articles for the conveyance or packing of goods, of
> plastics; stoppers, lids, caps and other closures, of
> plastics:
>                       * * *

| | |
|---|---|
| 3923.30.00 | Carboys, bottles, flasks and similar articles . |
| | * * * |
| 3923.50.00 | Stoppers, lids, caps and other closures . . . . . |

5.    Plaintiff claim that the subject merchandise is more properly classified as a "[t]oys representing animals or non-human creatures . . . Other" under HTSUS subheading 9503.49.00 (1995). In relevant part, heading 9503 and subheading 9503.49.00 cover

| | |
|---|---|
| 9503 | Other toys; reduced-size ("scale") models and similar recreational models, working or not; puzzles of all kinds; parts and accessories thereof: |
| | * * * |
| 9503.30.00 | Other construction sets and constructional toys, and parts and accessories thereof |
| |     Toy building blocks, bricks and shapes . . . . |
| |     Other . . . . . . . . . . . . . . . . . . . . . . . . . |
| | Toys representing animals or non-human creatures (for example, robots and monsters) and parts and accessories thereof: |
| 9503.41.00 |     Stuffed toys and parts and accessories thereof . . . . . . . . . . . . . . |
| | * * * |
| 9503.49.00 |     Other . . . . . . . . . . . . . . . . . . . . . . . . . |

6.    Examination shows the subject merchandise to be blow-molded, three-dimensional, plastic objects in the form of well-recognized children's characters ("Big Bird," "Elmo," "Cookie Monster," "Snoopy Flying Ace," "Ernie," and "Zoe"). The merchandise is intricately shaped to provide full and accurate representation of these characters in all respects. The various, well-recognized colors used on the subject merchandise enhances the accuracy of these representations (e.g., Snoopy's body is white, his nose is black, and he wears a brown flying helmet and a yellow scarf; Big Bird is yellow with white eyes with pink and blue rims, orange feet and a red bath brush). Although the heads of these characters are removable, none of the limbs are moveable.

7.    Because the subject merchandise is shaped and colored like well-recognized children's

characters, it is not immediately obvious, absent marking or other indication, that the bottom part of the merchandise is a bottle. The "bottle" aspect of the merchandise only becomes apparent when the "head" of the merchandise is removed, revealing a screw-cap top on the "body" section of the merchandise.

8.    The court finds highly probative and credible the testimony of Larry J. Wilhelm, Minnetonka's founder, former president and current chairman of the board, that the subject merchandise was specifically designed as three-dimensional character representations in order to add toy or play value to Minnetonka's product line of children's bubble bath. Trial Transcript ("Tr.") at 29.

9.    Although the relevant licensing agreements with Colgate-Palmolive Co. (Children's Television Workshop) and United Feature Syndicate, Inc. do not explicitly cover the production of "toys," see Defendant's Exs. C and D, Minnetonka personnel understood the agreements as prohibiting them from selling strictly toys or referring to the merchandise as "toys" in advertisements. They did not understand the agreements as prohibiting Minnetonka from marketing products with a significant play or toy element. See Tr. at 42, 48-49, 52, 86, 102, 108, 109, 144 (testimony of Larry Wilhelm), 286 (testimony of Julie Beno, marketing manager and independent consultant for Minnetonka).

10.    The development of the subject merchandise, using artists' renderings and clay and wax sculptures, involved a different process than that used to designed a conventional oval or cylindrical bottle. Id. at 30, 35 (testimony of Larry Wilhelm).

11.    The production of the subject merchandise is much more complicated, less efficient, and up to ten times as expensive as the production of the "flat" bottles sold by Minnetonka. Id. at 35-37 (testimony of Larry Wilhelm).

12.    Minnetonka selected a toy manufacturer, rather than their regular domestic bottle suppliers, to make the subject merchandise, since the bottle suppliers were technically unable to do the detailed blow-molding or hand-painting that was necessary. Id. at 30-31 (testimony of Larry Wilhelm).

13. The subject merchandise is never sold empty. Rather, the goods are always filled with bubble bath for retail sale. See, e.g., id. at 66, 98-100, 146-47 (testimony of Larry Wilhelm).

14. The threads on the cap and neck of the subject merchandise are standard within the packaging industry, meaning that they can work with a variety of different bottles. Id. at 208 (expert testimony of Dr. Sher Paul Singh, Associate Professor at the School of Packaging at Michigan State University).

15. The bottom part of the subject merchandise has the qualities of a "bottle," and also fulfills the four basic functions of a "package": containment, protection, utility (i.e., the dispensing feature of the package), and communication of information. Id. at 176-77, 186-89, 240 (expert testimony of Dr. Sher Paul Singh). Defendant's sole witness also stated, however, that he was unable to testify that the subject merchandise was not also a toy. Id. at 196, 240-41 (testimony of Dr. Sher Paul Singh).

16. The "heads" of the subject merchandise are not containers and do not enhance the containment or utility of the bottom ("bottle") portion of the merchandise. Id. at 206-07 (expert testimony of Dr. Sher Paul Singh).

17. The subject merchandise is not as efficient a container as a typical flat bottle, since the intricate details of the three-dimensional characters make the merchandise prone to leakage and breakage. Id. at 56-57 (testimony of Larry Wilhelm); see also id. at 211 (expert testimony of Dr. Sher Paul Singh that leak resistance is an important factor in the design of a bottle).

18. The heavy metal content of the subject merchandise is tested regularly, in accordance with toy industry standards, and the cap for the subject merchandise was produced to be oversized, so that it would pass the toy industry's "choke test." Id. at 75-80, 112 (testimony of Larry Wilhelm).

19. The court finds highly probative and credible the expert testimony of Dr. Elizabeth Hirschman in the field of semiotics (the study of cultural signs or cultural meaning). Dr. Hirschman stated that, in her expert opinion, the subject goods are anthropomorphized icons ("iconic figures"),

meaning that people project human-like traits onto the merchandise. Id. at 400-01, 413, 427-28, 430-31. This is true notwithstanding the fact that the merchandise contains or could contain bubble bath. Id. at 430. Dr. Hirschman testified that it is very easy for children to project the particular personality and character traits of well-known characters (such as "Big Bird") onto the subject merchandise, and see the merchandise "as a person like themselves." See id. at 405. Dr. Hirschman also found other types of "bottles" or "bottle-toy" combinations to have less anthropomorphic or toy potential than the subject merchandise. See id. at 420-431.

20.   Children play with the subject merchandise both in and out of the bathtub. See id. at 271-72 (testimony of Julie Ann Beno that her child carries the merchandise under his arm like a little doll, talks to the goods and makes the goods kiss each other, and that she has observed other children "play with [the merchandise], talk to them, make them dance or walk along the floor, line them up in a row"); id. at 403 (testimony of Dr. Elizabeth Hirschman that her child "liked them very much" and "played with them in the bathtub."); id. at 242-47 (testimony of Krystyna Bodlak that her grandchild played with the merchandise in the bathtub).

21.   Children generally play with the subject merchandise as toys, either in or out of the bath, after the containers are emptied of bubble bath. Id. at 354-55 (testimony of Anne Fleming, Vice-President in charge of marketing at Peters Marketing); Plaintiff's Ex. 10 at Table 7; Plaintiff's Ex. 11, Section I at Table 6.

22.   Mothers generally purchase the subject merchandise under pressure from their children. Tr. at 353-54, 364 (testimony of Anne Fleming); Plaintiff's Exs. 10 and 11 at Table 4.

23.   The majority of mothers purchase the subject merchandise mainly for the amusement value of the container, rather than the bubble bath inside. Tr. at 353 (testimony of Anne Fleming); Plaintiff's Ex. 10 at Table 10; Plaintiff's Ex. 11, Section I at Tables 10 and 11.

24.   Rather than buying multiple versions of the same character, customers will sometimes buy different versions of the subject merchandise to complete a collection. Tr. at 94 (testimony of Larry Wilhelm).

25. The subject merchandise is sold in the children's toiletries section of stores, rather than the toy section. Id. at 91-92, 100-101 (testimony of Larry Wilhelm), 294-96 (testimony of Julie Beno).

26. The subject merchandise does not compete directly for sales with bubble bath sold by Minnetonka in flat plastic bottles. Id. at 38-39, 71-72 (testimony of Larry Wilhelm); 291 (testimony of Julie Beno); Plaintiff's Ex. 11, Section I at Table 9.

27. Examination of advertisements for the subject merchandise (Plaintiff's Exs. 9A, 9B, 9C, 9D and 9E) shows little emphasis on the bubble bath contained inside the subject merchandise.

28. The suggested retail price of the subject merchandise is many times greater than that of a plain, flat-sided container filled with more bubble bath. Tr. at 38-39 (testimony of Larry Wilhelm); 290-91 (testimony of Julie Beno).

29. If any of these Findings of Fact shall more properly be Conclusions of Law, they shall be deemed to be so.

## CONCLUSIONS OF LAW

30. The court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1581(a) (1994). Plaintiff timely commenced this action within 180 days of Customs' denial of its protest, and all liquidated duties and charges were timely paid.

31. The court has a duty to find the correct classification of merchandise. Jarvis Clark Co. v. United States, 733 F.2d 873, 878 (Fed. Cir. 1984). To this end, the court employs a two-step process: first, construe the relevant tariff classifications; and second, determine under which of the properly construed tariff headings the merchandise at issue falls. Bausch & Lomb Inc. v. United States, 148 F.3d 1363, 1364-66 (Fed. Cir. 1998). The first step in this process is a question of law, while the second step is a factual inquiry. Id. at 1366.

32. "The meaning of a tariff term, a matter of statutory interpretation, is a question of law." Mead

Corp. v. United States, 185 F.3d 1304, 1306 (Fed. Cir. 1999), cert. granted, 120 S.Ct. 2193 (May 30, 2000). Where, as here, Customs has not promulgated any relevant regulations, "but has merely issued a classification ruling implicitly interpreting an HTSUS provision," the court does not give Customs' interpretation Chevron[1] deference. Id. at 1306-08. Rather, the court construes a tariff term according to its common and commercial meanings, which it presumes are the same. Id. at 1308. The court may consult "dictionaries, scientific authorities, and other reliable information sources" to ascertain a tariff term's common meaning. Id.

33. Customs' classification decisions are presumed to be correct, and the party challenging the classification has the burden of proving otherwise. See 28 U.S.C. § 2639(a)(1) (1994). "The presumption of correctness is a procedural device that is designed to allocate, between the two litigants to a lawsuit, the burden of producing evidence in sufficient quantity. Specifically, the importer must produce evidence (the burden of production portion of the burden of proof) that demonstrates by a preponderance (the burden of persuasion portion of the burden of proof) that Customs' classification decision is incorrect." Universal Electronics., Inc. v. United States, 112 F.3d 488, 492 (Fed. Cir. 1997) (footnote omitted). The court reviews the factual aspects of Customs' classification decisions de novo under 28 U.S.C. § 2638, § 2640(a)(1), and § 2643(b) (1994).

34. Classification of goods in the tariff schedule is governed by the General Rules of Interpretation ("GRIs") of the HTSUS and the Additional U.S. Rules of Interpretation ("ARIs"). In relevant part, GRI 1 provides that "classification shall be determined according to the terms of the headings and any relative section or chapter notes and, provided such headings or notes do not otherwise require, according to [the subordinate GRIs]." (emphasis added).

35. Note 2(u) to Chapter 39 provides that "[t]his chapter [covering plastics and articles thereof] does not cover . . . [a]rticles of chapter 95 (for example, toys, games, sports equipment)." Pursuant to this chapter note, the court finds that if the subject merchandise is prima facie

---

[1] Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 (1984) ("[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.")

classifiable under heading 9503, as Plaintiff claims, the merchandise may not be classified in Chapter 39. See Midwest of Cannon Falls, Inc. v. United States, 122 F.3d 1423, 1429 (Fed. Cir. 1997) (construing similar chapter note). This is true even if the merchandise is otherwise described by a heading in Chapter 39.

36. The term "toys" for purposes of heading 9503 is not defined by statute. Webster's Third New International Dictionary, however, provides the following relevant definitions for "toy":

> **3 a:** something designed for amusement or diversion rather than practical use **b:** an article for the playtime use of a child either representational (as of persons, creatures, or implements) and intended esp. to stimulate imagination, mimetic activity, or manipulative skill or nonrepresentational (as balls, tops, jump ropes) and intended esp. to encourage manual and muscular dexterity and group integration.

Webster's Third New International Dictionary (1986) at 2419. The Oxford English Dictionary similarly defines "toy" as:

> **6.** A material object for children or others to play with (often an imitation of some familiar object); a plaything; also, something contrived for amusement rather than for practical use (esp. in phrase *a **mere** toy*).

The Oxford English Dictionary, 2nd Ed. (Vol. XVIII 1989) at 329 (emphasis in original). For its part, the American Heritage Dictionary defines "toy" as "[a]n object for children to play with." American Heritage Dictionary (2nd College Ed. 1982) at 1283

37. Although nothing in heading 9503 or the relevant chapter notes explicitly states that an item's classification as a "toy" is dependent upon its use, the court finds inherent in the above definitions the notion that an object is a toy only if it is designed and used for amusement, diversion or play, rather than practicality. See Orlando Foods Corp. v. United States, 140 F.3d 1437, 1441 (Fed. Cir. 1998) (finding "[i]nherent in the term 'preparation' . . . the notion that the object involved is destined for a specific use"). Consequently, the court construes

heading 9503 as a "principal use" provision, insofar as it pertains to "toys."[2]

38.     Because heading 9503 is, in relevant part, a principal use provision, classification under this provision is controlled by the principal use "of goods of that <u>class or kind to which the imported goods belong</u>" in the United States at or immediately prior to the date of importation.  ARI 1(a) (emphasis added); <u>see</u> <u>Primal Lite, Inc. v. United States</u>, 182 F.3d 1362, 1365 (Fed. Cir. 1999) (construing ARI 1(a) as "call[ing] for a determination as to the group of goods that are commercially fungible with the imported goods"); <u>Group Italglass U.S.A., Inc. v. United States</u>, 17 CIT 1177, 1177, 839 F. Supp. 866, 867 (1993) (stressing "that it is the principal use of the class or kind of goods to which the imports belong[ed]" at or immediately prior to the dates of importation, "and not the principal use of the specific imports[,] that is controlling under the Rules of Interpretation").  "Principal use" is defined as the use "which exceeds any other single use of the article."  Conversion of the Tariff Schedules of the United States Annotated Into the Nomenclature Structure of the Harmonized System:  Submitting Report at 34-35 (USITC Pub. No. 1400) (June 1983).

39.     The court finds the "class or kind" of articles considered "toys" under heading 9503 to be articles whose principal use is amusement, diversion or play, rather than practicality.

40.     To determine whether the subject imports are of the "class or kind" of merchandise whose principal use is amusement, diversion or play, as Plaintiff claims, or the conveyance or

---

[2] This conclusion is also consistent with the definition and treatment of the term "toy" under the predecessor to the HTSUS, the Tariff Schedules of the United States ("TSUS").  <u>See, e.g.</u>, <u>J.C. Penney Purchasing Corp. v. United States</u>, 10 CIT 727, 728 (1986) (noting that schedule 7, part 5, subpart E, headnote 2 of the TSUS defined a "toy" as "any article chiefly used for the amusement of children or adults"); <u>Ideal Toy Corp. v. United States</u>, 78 Cust. Ct. 28, 33 (1977) ("When amusement and utility become locked in controversy, the question becomes one of determining whether the amusement is incidental to the utilitarian purpose, or the utility purpose incidental to the amusement."); <u>see also</u> <u>Pima Western, Inc. v. United States</u>, 20 CIT 110, 116-17, 915 F. Supp. 399, 404-05 (1996) ("[O]n a case-by-case basis prior decisions should be considered instructive in interpreting the HTS, particularly where the nomenclature previously interpreted in those decisions remains unchanged and no dissimilar interpretation is required by the text of the HTS[US]." (quoting H. Conf. R. No. 576, at 549-50)).

packaging of goods, as Defendant claims, the court examines all pertinent circumstances. United States v. Carborundum Co., 63 C.C.P.A. 98, 102, 536 F.2d 373, 377 (1976). Factors which have been considered in making this determination include (1) the general physical characteristics of the merchandise; (2) the expectation of the ultimate purchasers; (3) the channels, class or kind of trade in which the merchandise moves; (4) the environment of the sale (i.e., accompanying accessories and the manner in which the merchandise is advertised and displayed); (5) usage, if any, in the same manner as merchandise which defines the class; (6) the economic practicality of so using the import; and (7) the recognition in the trade of the use. Id.; see, e.g. United States v. Border Brokerage Co., Inc., 706 F.2d 1579, 1582 (Fed. Cir. 1983); Hartz Mountain Corp. v. United States, 19 CIT 1149, 1151, 903 F. Supp. 57, 59-60 (1995); Kraft, Inc. v. United States, 16 CIT 483, 489 (1992) (applying Carborundum factors). "Susceptibility, capability, adequacy, or adaptability of the import to the common use of the class is not controlling." Carborundum, 63 C.C.P.A. at 102, 536 F.2d at 377.

41. Based on the foregoing Findings of Fact, the court finds the subject merchandise to be of the class or kind of merchandise whose principal use is amusement, diversion or play, rather than the conveyance or packaging of goods. The unique physical characteristics of the merchandise, the design and marketing of the merchandise as items of amusement (rather than as bubble bath containers), the anthropomorphic nature of the merchandise, the expectation of the ultimate purchasers that these objects will be used for play, the regular use of the merchandise by children for amusement purposes, the fact that the merchandise does not compete with (and sells at a large premium to) bubble bath in flat plastic bottles, and other facts revealed at trial, support this conclusion. Accordingly, Plaintiff has rebutted the presumption of correctness (28 U.S.C. § 2639(a) (1994)) that attaches to Custom's classification.

42. The court rejects Defendant's argument that, because Minnetonka was in the business of selling bubble bath, and the use of the subject merchandise was to increase sales of bubble bath, the principal use of the merchandise was the conveyance or packaging of bubble bath. Defendant's Post Trial Memorandum Of Law at 22. While the subject merchandise is used for conveying bubble bath, it is an inefficient product for this purpose in terms of both quality and price. Moreover, the evidence demonstrates that the value of the merchandise comes from its utility as a source of play and amusement, rather than as a container for bubble bath.

43.     Because the evidence shows that the subject merchandise belongs to the class or kind of merchandise whose principal use is amusement, diversion or play, the court finds that the merchandise is properly classified as "toys" under HTSUS heading 9503.  By operation of this finding alone,[3] as well as by operation of Note 2(u) to Chapter 39, HTSUS, the subject merchandise cannot be classified under HTSUS heading 3923.

44.     In the alternative, if heading 9503's reference to "toys" is more properly viewed as an eo nomine provision,[4] rather than a "principal use" provision, the evidence above shows the subject merchandise to be prima facie classifiable under heading 9503.  Thus, pursuant to Note 2(u) to Chapter 39, the subject merchandise cannot be classified under HTSUS heading 3923.

45.     Having found the subject merchandise properly classifiable under heading 9503, the court must determine under which subheading the merchandise is properly classified.  See GRI 6; see also Orlando Food Corp., 140 F.3d at 1442.

46.     The first level of subheadings under Heading 9503 (i.e., subheadings indented once) reveals seven possible classifications:

1.      "Electronic trains, including tracks, signals and other accessories thereof"

2.      "Reduced-size ('scale') model assembly kits . . . parts and accessories thereof"

3.      "Other construction sets and constructional toys, and parts and accessories thereof"

---

[3] A finding that subject merchandise is properly classified under one principal use provision necessarily precludes its classification from another principal use provision.  See Lennox Collections v. United States, 20 CIT 194, 196 (1996) ("Principal use is defined as the use which exceeds any other single use.  Consequently, the fact that the merchandise may have numerous significant uses does not prevent the Court from classifying the merchandise according to the principal use of the class or kind to which the merchandise belongs.") (quotations, citation and emphasis omitted).

[4] In contrast to actual and principal use provisions, which classify goods by use, "[a]n eo nomine classification provision is one which describes a commodity by a specific name."  Clarendon Marketing, Inc. v. United States, 144 F.3d 1464, 1467 (Fed. Cir. 1998).

4.      "Toys representing animals or non-human creatures (for example, robots and monsters) and parts and accessories thereof"

5.      "Toy musical instruments and apparatus and parts and accessories thereof"

6.      "Puzzles and parts and accessories thereof"

7.      "Other toys, put up in sets or outfits, and parts and accessories thereof."

47.      Based on the facts above, the court finds the subject merchandise properly classified within the subheading covering "[t]oys representing animals or non-human creatures (for example, robots and monsters) and parts and accessories thereof."  The various characters depicted by the subject merchandise ("Snoopy Flying Ace," "Big Bird," "Cookie Monster," "Elmo," etc.) clearly qualify as "toys representing . . . non-human creatures."[5]  In contrast, the subject merchandise is not an "electric train," "musical instrument," "puzzle" or any of the toys described by the other subheadings.

48.      Turning to the final level[6] of subheadings, the court notes two possible choices:  (1) subheading

---

[5] While Ernie appears to be the most human-like of the characters, the court finds Ernie's cartoon-like figure, orange complexion, red button nose, and oval head a sufficient basis for finding him a "non-human creature" for present purposes.  See Harmonized Commodity Description and Coding System, Explanatory Notes (1st ed. 1986) ("Explanatory Notes") at 1587 (noting that heading 9503 covers "[t]oys representing animals or non-human creatures even if possessing predominantly human physical characteristics (e.g., angels, robots, devils, monsters)") (emphasis added).  The Explanatory Notes are the official interpretation of the scope of the Harmonized Commodity Description and Coding System (which served as the basis of the HTSUS) as viewed by the Customs Cooperation Council, the international organization that drafted the international nomenclature.  Thus, while the Explanatory Notes "do not constitute controlling legislative history," they "nonetheless are intended to clarify the scope of HTSUS subheadings and to offer guidance in interpreting its subheadings."  Mita Copystar Am. v. United States, 21 F.3d 1079, 1082 (Fed. Cir. 1994) (citing Lynteq, Inc. v. United States, 976 F.2d 693, 699 (Fed. Cir. 1992)).

[6] The statistical suffixes under subheading 9503.49.00 ("Toys not having a spring mechanism" and "Toys having a spring mechanism") are irrelevant for classification purposes,  since such suffixes are not part of the legally binding, statutory language of the HTSUS.  Pima Western, 20 CIT at 116, 915 F. Supp. at 404.

9503.41.00, covering "[s]tuffed toys and parts and accessories thereof," and (2) subheading 9503.49.00, entitled "[o]ther." As the hollow figures at issue are clearly not "stuffed toys," the subject merchandise must be classified under the basket provision for "[o]ther." The court therefore agrees with Plaintiff, and finds the subject merchandise correctly classified under HTSUS subheading 9503.49.00.

49.     If any of these Conclusions of Law shall more properly be Findings of Fact, they shall be deemed to be so.

_____
Evan J. Wallach, Judge

Dated:          July 24, 2000
                New York, New York

_____