**Slip Op. 02-120**

# UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE: RICHARD K. EATON, JUDGE**

| | | |
|---|---|---|
| **AUTOMATIC PLASTIC MOLDING, INC.**, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **Court No. 99-06-00365** |
| | : | |
| **UNITED STATES**, | : | |
| Defendant. | : | |

[Judgment entered for Plaintiff.]

Decided: October 5, 2002

Law Office of George R. Tuttle, A P.C. (George R. Tuttle, III, Matthew K. Nakachi), and Law Office of Michael J. Tonsing (Michael J. Tonsing), for Plaintiff.

Robert D. McCallum, Jr., Assistant Attorney General; John J. Mahon, Acting Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice (Mikki Graves Walser), for Defendant.

## OPINION

EATON, Judge: Before the court is a dispute brought by Automatic Plastic Molding, Inc. ("Plaintiff"), challenging the classification by the United States Customs Service ("Customs") of certain glass containers (the "Merchandise"). The court exercises jurisdiction pursuant to 19 U.S.C. § 1581(a) (2000) and, based on the findings of fact and conclusions of law set forth below, enters judgment for Plaintiff, pursuant to USCIT R. 52(a) and 58.

## BACKGROUND

Plaintiff challenges the classification of two entries of the Merchandise imported in June and July of 1997, and liquidated by Customs in May of 1998. Customs classified the Merchandise as: "Glassware of a kind used for table, kitchen, . . . indoor decoration or similar purposes (other than that of heading 7010 or 7018)" under subheading 7013.39.20 of the Harmonized Tariff Schedule of the United States (1997) ("HTSUS"), entered at a duty rate of 27.8 percent ad valorem. (Answer ¶ 5.) As the importer of record, Plaintiff timely filed protests as to these liquidations, which protests Customs denied on May 4, 1999. Following these denials, Plaintiff commenced this action asserting that the Merchandise is properly classified as: "Carboys, bottles, flasks, jars, pots, vials, ampoules and other containers, of glass, of a kind used for the conveyance or packing of goods" under HTSUS subheading 7010.91.50, which would enter free. (Compl. ¶ 6.)

This case was tried on April 2–4, 2002, in New York City, and was the subject of post-trial briefing. During the course of the trial the court heard testimony from four witnesses called by Plaintiff, and three witnesses called by the United States Government (the "Government") on behalf of Customs. Plaintiff's witnesses were:

    (a)    William Preston, Chairman and Past President, Automatic Plastic Molding, Inc., the Plaintiff importer and distributer of the Merchandise;

    (b)    Roberto Del Bon, managing director of Vetrerie Bruni, the company that designed, produced and supplied the Merchandise;

    (c)    Dean Polik, President of Acme Foods, Inc., the company

that purchased the Merchandise from Plaintiff, packed it with biscotti and then sold the packed Merchandise to Costco Wholesale Corporation; and

(d)     Robert Cirrito, President of PROTEC Industries. Mr. Cirrito received his MBA from Barry University and was qualified as an expert in the area of commercial glass containers used for packaging, and the process associated with the production of commercial glass containers used for packaging.

(Pretrial Order of 01/09/02, Schedule G-1.)

The Government's witnesses were:

(a)     Rose Marie Lava, National Import Specialist, National Commodity Specialist Division, United States Customs Service;

(b)     Elizabeth A. Vega, Import Specialist, United States Customs Service; and

(c)     Dr. Sher Paul Singh, a Professor at Michigan State University. Dr. Singh received his Ph.D from Michigan State University and was qualified as an expert in the area of the design, materials, and marketing of articles used for the conveyance or packing of goods.

(Id., Schedule G-2.)

Here, the court makes its findings of fact and conclusions of law as a result of a trial de novo. See 28 U.S.C. § 2640(a) (2000) ("The Court of International Trade shall make its determinations upon the basis of the record made before [it] . . . ."); see also United States v. Mead Corp., 533 U.S. 218, 233 n.16 (2001) ("Although Customs's decision 'is presumed to be correct' on review, 28 U.S.C. § 2639(a)(1), the CIT 'may consider any new ground' even if not

raised below, § 2638, and 'shall make its determinations upon the basis of the record made before the court,' rather than that developed by Customs . . . ."); Kraft, Inc. v. United States, 16 CIT 483, 484 (1992).

## DISCUSSION

### I. Findings of Fact

#### A. Facts Stipulated to by the Parties

The Merchandise (identified on the commercial invoices as Style # 05856P—Vaso Anfora [sic] Ottagon 4250 T 110) is a stylized amphora-shaped clear glass container measuring approximately 12.5 inches tall and 24 inches in circumference at its widest point, with two hook-shaped handles protruding from the neck. The Merchandise is made of ordinary glass, and is manufactured by machines that automatically feed molten glass into molds and form the shape of the Merchandise by the action of compressed air, has a volume of 4.25 liters, and a large opening with a lip or flange to hold a lid or cap measuring 110 millimeters in diameter. The invoice price paid by Plaintiff to the Merchandise's supplier, Vetrerie Bruni, was approximately $1.53 for each container. Plaintiff sold the Merchandise to Acme Foods, Inc. ("Acme") (a wholesale food company), which in turn sold the Merchandise packed with twenty-two biscotti to Costco Wholesale Corporation ("Costco") for approximately eleven to $12 each. Costco then resold the Merchandise packed with the biscotti to its retail customers for approximately $15 to $16.

### B.        Facts Established at Trial

The court finds that the following facts were established by credible evidence at trial. The Merchandise's "Finish" (which is the opening of the container, its sealing surface, and the glass lugs[1] which grasp a properly sized closure to form a seal) is equal to the industry standard specification of 2070 and, when a standard sized closure is twisted on, is capable of forming a seal sufficient for the Merchandise to convey food in a sanitary manner.  The Merchandise is capable of being used in the "hot packing" process[2]

Upon sale by Plaintiff, the Merchandise was shipped directly from the supplier to Acme for packing.  The Merchandise was never sold empty to the public, nor was the Merchandise sold

---

[1]        "Lugs" are molded threads that grip a twist-on cap.

[2]        In Kraft, the court explained:

> In the hot pack process jams, jellies and other food products are heated and then poured into glass containers.  Steam is then injected onto the top of the food product and a lid is fastened to the jar.  The steam heats the sealing material inside the lid and, as the steam cools, creates a vacuum in the jar which draws the lid tightly against the sealing surface of the jar.  The seal created in this process preserves the food products and allows the consumer to readily determine whether the seal has been broken.

Kraft, 16 CIT at 487.  At trial, Plaintiff's witness, Mr. Del Bon, stated that the Merchandise was designed to be used in the hot packing process and that the Merchandise underwent thermo-shock testing after manufacture. (Tr. at 166:22–25.)  Defendant's witness, Dr. Singh, stated that the process identified as "hot packing" was normally referred to in the packaging industry as "hot filling" (id. at 578:16–18); nonethelesss he also conceded that the terms "have been interchangeably used" (id. at 616:23–24).  Dr. Singh conducted no tests on the Merchandise with respect to hot packing (id. at 565:11–13) and was unable to state with certainty as to whether the Merchandise could or could not be used in the hot packing process. (Id. at 622:9.)  The court finds Mr. Del Bon's testimony credible.

at wholesale for any purpose other than that of being used as a container for conveying or packing food.

Acme sold the final product as a seasonal gift food item to Costco. Acme selected the Merchandise because: (1) it was inexpensive; (2) it could hold approximately twenty-two biscotti; and (3) the Merchandise's design was "different than a . . . jar of peanut butter, or a jar of pickles, or a jar of . . . something that you buy three hundred and sixty-five days a year, that you wouldn't give as a gift." (Tr. at 278:17–21.) In addition, Acme decided to use the Merchandise as a container for its biscotti because, unlike regular biscotti, this product was frosted and the glass allowed the biscotti to be displayed with its frosting visible to consumers: "we felt that our biscotti [were] attractive. . . . And, we . . . wanted the potential buyer to see the product, so we wanted something clear. And then, it just became a matter of trying to find something that was attractive and inexpensive. (Id. at 268:20–269:2.) Costco, in turn, resold the Merchandise packed with biscotti in its "seasonal aisle" together with "maybe thirty pallets of consumable gift food items." (Id. at 282:23, 283:5–6.) The Merchandise was never displayed or sold in an area where empty glassware, kitchen, or storage containers were sold.

The twenty-two biscotti (exclusive of the Merchandise) were sold at wholesale to Acme for $5.50 and would be valued at retail at between $22 and $25.

## C. The Court's Observation of the Merchandise

The court's examination of the Merchandise, and its comparison to the exhibits produced

at trial, confirms that the glass lugs render the Merchandise's Finish unattractive when paired with the wooden cap or lid with which it was sold. See Kraft, 16 CIT at 488 ("The bear jars, at least because of the lug finish, the mold seam, and the utilities lid necessitated by the lug finish, are not particularly handsome."). When offered for sale, the lugs were concealed by a ribbon. If the Merchandise were placed on a kitchen table or counter and used for food storage purposes, however, the lugs would not be concealed and would be, thus, unsightly. Moreover, the examples of storage containers provided by the Government had Finishes that were appropriate for use with a wooden cap or lid[3] incapable of forming a sanitary seal. None of the exhibits produced by the Government has a lug Finish. Nor is the Merchandise of the same quality as these exhibits. For example, Government Trial Exhibit P (a melon-shaped storage container), although approximately the same size as the Merchandise, is made of glass more substantial than the Merchandise. In addition, Government Trial Exhibits P and G (a smaller melon-shaped storage container) are made of glass of a greenish hue, and both have a more refined shape, which renders them more attractive and decorative than the Merchandise. Lastly, the Merchandise's opening is smaller than that of both of these exhibits, making the removal of the Merchandise's contents more difficult than the removal of the contents of the exhibits.

## II.     Conclusions of Law

This court has previously found headings 7010.91.50 and 7013.39.20 to be "principal

---

[3]      While the Merchandise packed with the biscotti was actually sold with a wooden lid rather than one that could twist on and make a sanitary seal, the fact that the Merchandise has a Finish that includes lugs capable of forming a sanitary seal when fitted with a properly sized closure is probative as to its principal use as a container for the conveyance or packing of goods.

use" provisions governed by the HTSUS Additional Rules of Interpretation ("ARI"). See Group

Italglass U.S.A., Inc. v. United States, 17 CIT 226, 228 (1993) ("Italglass I"). Neither Plaintiff

nor the Government disputes this finding. (Pl.'s Post-Trial Mem. at 8; Def.'s Post-Trial Mem. at

22.)[4] Accordingly, the ARI provide:

> 1. In the absence of special language or context which otherwise requires—
>
>    (a) a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of goods of that class or kind to which the imported goods belong, and the controlling use is the principal use . . . .

ARI 1(a). Thus, "[t]he principal use of the class or kind of goods to which an import belongs is

controlling, [and] not the principal use of the specific import." E.M. Chems. v. United States, 20

CIT 382, 387–88, 923 F. Supp. 202, 208 (1996) (citing Group Italglass, U.S.A., Inc. v. United

States, 17 CIT 1177, 1177, 839 F. Supp. 866 (1993) ("Italglass II"), see id. at 388, ("'Principal

use' is defined as the use 'which exceeds any other single use.' . . . As a result, 'the fact that the

merchandise may have numerous significant uses does not prevent the Court from classifying the

merchandise according to the principal use of the class or kind to which the merchandise

---

[4] Indeed, Customs has concluded headings 7010 and 7013 are "principal use" tariff provisions. See Treasury Decision 96-7; Tariff Classification of Imported Glassware: Change of Practice, 30 Customs Bulletin 30, 32, 61 Fed. Reg. 223, 224 (Jan. 3, 1996) ("Currently, tariff classification under both subheading 7010.91.50 and 7013.39, HTSUS, is determined by the use of the class or kind of articles to which the imported merchandise belongs. As such, they are considered provisions controlled by Additional U.S. Rule of Interpretation 1(a), HTSUS. Customs proposed that subheadings 7010.91.50 and 7013.39 would remain principal use provisions. Therefore, for an imported good to be classifiable in either of these subheadings, it must be of a class or kind classifiable in these subheadings. Whether it is of the class or kind of articles classifiable in either subheading will be determined by its principal use.").

belongs.'" (citations omitted, emphasis in original)).  Finally, "[a]lthough by statute Customs'

classification under subheading 7013.39.20 must be deemed as presumptively correct (28 U.S.C.

§ 2639(a)(1)), . . . plaintiff automatically overcomes the presumption of correctness attaching to

Customs' classification under heading 7013.39.20 simply by establishing that its glassware is

classifiable under heading 7010."  Italglass I, 17 CIT at 227.

The Government cites Customs' finding in Headquarters Ruling Letter 962378 ("HQRL

962378"), that the Merchandise is not principally used for the conveyance or packing of goods

and is, thus, precluded from being classifiable under heading 7010.  In its papers, the

Government contends that this finding was made in accordance with the guidelines announced in

T.D. 96-7; Tariff Classification of Imported Glassware: Change of Practice, 30 Customs Bulletin

30 (1996), 61 Fed. Reg. 223 (Jan. 3, 1996) ("T.D. 96-7").[5]  As such, the

---

[5]        Following the decisions in Kraft, G. Heilman Brewing Co. v. United States, 14
CIT 614 (1990) and United States v. Carborundum Co., 536 F.2d 373 (C.C.P.A. 1976), see Tariff
Classification of Imported Glassware: Proposed Change of Practice; Solicitation of Comments,
59 Fed. Reg. 51,659, 51,659 (Oct. 12, 1994), Customs issued T.D. 96-7, which states that the
following characteristics

> are indicative, but not conclusive of whether a particular glass
> article qualifies as part of the class "containers of glass of a kind
> used for the conveyance or packing of goods."  These
> characteristics would include containers of all shapes and sizes:
>
> 1.        generally having a large opening, a short neck (if any) and as a
>           rule, a lip or flange to hold the lid or cap, made of ordinary glass
>           (colorless or colored) and manufactured by machines which
>           automatically feed molten glass into molds where the finished
>           articles are formed by the action of compressed air;
>
> 2.        in which the ultimate purchaser's primary expectation is to
>           discard the container after the conveyed or packed goods

are used;

3.      sold from the importer to a wholesaler/distributor who then
         packs them with goods;

4.      sold in an environment of sale that features the goods
         packed in the jar and not the jar itself;

5.      used to commercially convey foodstuffs, beverages, oils,
         meat extracts, etc.;

6.      capable of being used in the hot packing process; and

7.      recognized in the trade as used primarily to pack and
         convey goods to a consumer who then discards the
         container after this initial use.

T.D. 96-7, 30 Customs Bulletin at 32–33, 61 Fed. Reg. at 224. The Government urges that
HQRL 962378 "complied with the standards set forth" in T.D. 96-7, and is therefore entitled to
deference under Skidmore v. Swift & Co., 323 U.S. 134 (1944) (Def.'s Post Trial Mem. at 10);
see Rocknel Fastener, Inc. v. United States, 267 F.3d 1354, 1357 (Fed. Cir. 2001) (holding
Skidmore deference is appropriate where Customs' classification decision revealed Customs'
thorough analysis). In Rocknel, the Court of Appeals for the Federal Circuit observed: "The
weight [accorded to an administrative] judgment in a particular case will depend upon the
thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier
and later pronouncements, and all those factors which give it power to persuade, if lacking power
to control." Rocknel, 267 F.3d at 1358 (quoting Skidmore, 323 U.S. at 140). Here, Customs'
determination that the Merchandise is not classifiable under subheading 7010.91.50 is both
selective and conclusory, and simply does not follow from the criteria set out in T.D. 96-7,
Carborundum, and Kraft. For example, HQRL 962378 claims that the Merchandise "is
configured to hold a rubber lined, wooden lid." (Def.'s Post-Trial Mem. Ex. 1 at 4.) This is true
as far as it goes, and indeed such a lid was used on the Merchandise packed with biscotti when it
was sold at retail. Customs chose to ignore, however, that the Merchandise has lugs, which are
an integral part of the Merchandise's Finish. It is these lugs that make the Merchandise able to
accept a standard closure capable of forming a sanitary seal, and that allows the Merchandise to
be used in the hot packing process. By ignoring the presence of the lugs, Customs disregarded
one of the seven factors "indicative but not conclusive" of proper classification of merchandise
under 7010. See T.D. 97-6, 30 Customs Bulletin at 32, 61 Fed. Reg. at 224. Further, while
Customs concluded that the Merchandise "appears to be manufactured by automatic machines
from ordinary glass" it gives no weight to this factor, even though it is enumerated as part of T.D.
96-7. Finally, HQRL 962378 states, without any form of explanation: "The cost of the cookie
filled article ($16.00) supports the conclusion that the glass jar is the primary focus of the

Government urges that HQRL 962378 be accorded deference pursuant to Skidmore v. Swift &

Co., 323 U.S. 134 (1944).  Thus, at trial, the Government made only a limited attempt to justify

its classification of the Merchandise as "Glassware of a kind used for table, kitchen . . . indoor

decoration, or similar purposes" under subheading 7013.39.20.  Rather, the Government focused

its efforts on refuting Plaintiff's asserted classification.

In applying the law to the established facts, the court first turns to the factors set forth in

United States v. Carborundum Co., 536 F.2d 373 (C.C.P.A. 1976).  The court in Carborundum

listed several "[f]actors which have been considered by courts to be pertinent in determining

whether imported merchandise" is classifiable under a particular "principal use" tariff provision:

(1) the "general physical characteristics of the merchandise"; (2) "the expectation of the ultimate

purchasers"; (3) "the channels, class or kind of trade in which the merchandise moves"; (4) "the

environment of the sale," (i.e., the manner in which the merchandise is advertised and

displayed)"; (5) "the use, if any, in the same manner as merchandise which defines the class"; (6)

"the economic practicality of so using the import"; and finally (7) "the recognition in the trade of

this use."  Id. at 377 (citations omitted).

The Kraft court applied these factors and found that the merchandise at issue there—glass

---

purchaser with the contents simply emphasizing a suggested use of the reusable jar."  (Def.'s
Post-Trial Mem. Ex. 1 at 5.)  This conclusion without more is simply unconvincing.  Therefore,
the court finds that HQRL 962378 does not have "power to persuade" and, thus, does not qualify
for Skidmore deference.  See Mead Corp. v. United States, 283 F.3d 1342, 1350 ("The
classification ruling at issue here lacks the power to persuade under the principles set forth in
Skidmore.").

jars molded into the shape of small bears, packed with grape jelly or strawberry jam for retail

sale, and used in a promotional campaign created to market their contents—was classifiable

under subheading 545.27 of the Tariff Schedule of the United States ("TSUS").[6]  See Kraft, 16

CIT at 487, 489.  In applying the Carborundum factors, the court found convincing, among other

things, that: (1) the glass jars at issue were capable of being used in the "hot packing" process (id.

at 489); (2) that a comparison of the price of the contents with the price of the jar indicated that

consumers would not purchase the contents as a means of acquiring the container (id.); (3) that

glass containers for food products generally go directly from the manufacturer to the packing

plant (id.); and (4) that the design of glass containers and packing are important in marketing

food products, because they can be used to attract consumers' attention in order to increase sales

(id.).  Accordingly, the court found that "although [the bear jars'] shape is more elaborate than

straight-sided jars, it is not more elaborate than several well-known jars . . . commonly used to

pack and market food products.  The bear jars are beyond doubt chiefly so used."  Kraft, 16 CIT

at 489.

This court too finds that the Merchandise is properly classifiable under heading 7010.  In

reaching this conclusion, the court applies the factors that were announced in Carborundum,

amplified in Kraft, and enumerated in T.D. 96-7.  First, the general physical characteristics of the

---

[6]      It is undisputed in this litigation that subheading 545.27 TSUS is the predecessor provision of heading 7010.91.  (See Pl.'s Post-Trial Mem. at 11 n.2 ("In the USITC's report on the conversion of the TSUS to the HTSUS, Item 545.27, TSUS, is cross-referenced directly to HTSUS subheading 7010.91." (citation omitted)); see also Def.'s Pre-Trial Mem. at 24 ("Item 545.27 [TSUS] . . . [is] the predecessor provision to Heading 7010, HTSUS, one of the provisions at issue here.").)

Merchandise demonstrate its capacity to be used as a container for the conveyance or packing of goods. See Carborundum, 536 F.2d at 377; (see also Pl.'s Trial Ex. 1.) The Merchandise has a large opening, a short neck, and is "made of ordinary glass . . . and manufactured by machines which automatically feed molten glass into molds where the finished articles are formed by the action of compressed air . . . ." See T.D. 96-7, 30 Customs Bulletin at 32, 61 Fed Reg. at 224 (providing that such physical characteristics are "indicative" of merchandise properly classifiable under subheading 7010.91.50). Moreover, the Merchandise has a lug Finish designed to accept a standard-size closure which, when twisted on, is capable of forming a seal sufficient for the Merchandise to convey food in a sanitary manner. See Kraft, 16 CIT at 487 ("Glass containers used to pack, . . . or market food products have . . . parts . . . includ[ing] a sealing surface, glass lugs used to attach the closure, [and] the finish . . . . These parts are essential in order for the containers to function as a sanitary container for food products . . . ."). In addition, the Merchandise is capable of withstanding the "hot packing" process. See Kraft, 16 CIT at 489 (finding that glass containers classifiable under subheading 545.27, TSUS, "must be designed for use in the hot pack process."); T.D. 96-7, 30 Customs Bulletin at 33, 61 Fed. Reg. at 224.

Secondly, while neither party produced credible evidence as to what the expectations of the ultimate purchaser might be with respect to keeping or discarding the Merchandise after the biscotti were removed, the evidence of the retail value of the biscotti alone is probative as to a purchaser's motivation in selecting the goods. The retail value of the biscotti was between $22 and $25. Costco, a retail discounter, offered the Merchandise filled with biscotti for between $15 and $16. This evidence suggests that consumers would conclude that they were getting a bargain

on the biscotti alone. Thus, as the price of the Merchandise packed with the biscotti was directly correlated to the retail value of the twenty-two biscotti, the court finds that "[a]cquisition of the container [was] incidental" to the purchase of the biscotti. Kraft, 16 CIT 489. Indeed, there is no indication that the relationship between the cost to the packer of the Merchandise (approximately $1.53) to the wholesale cost of the biscotti packed inside (approximately $5.50) would not continue at the retail level. This relationship does not appear to reveal an inverse ratio that would indicate that the Merchandise—and not the biscotti—was the item being offered for sale. Compare Kraft, 16 CIT at 489 ("Evidence of the price of the products in comparison with the price of the jar indicates the consumers ordinarily would not purchase the food product as a means to acquire the container."), with Minnetonka Brands, Inc. v. United States, 24 CIT __, __, 110 F. Supp. 2d 1020, 1024 (2000) (finding consumers "purchase[d] the subject merchandise mainly for the amusement value of the container, rather than the bubble bath inside," in part, because "[t]he suggested retail price of the subject merchandise [was] many times greater than that of a plain, flat-sided container filled with more bubble bath."). In addition, the court's observation of the Merchandise, particularly in comparison with the exhibits provided by the Government, confirms that the Merchandise is neither as attractive nor of the same quality as these exhibits; and because of its smaller opening is not capable of providing the same utility. This being the case, it is simply not likely that "[b]ecause of the unusual and attractive shape, an ultimate purchaser's primary expectation would be to reuse the article after the conveyed or packed goods are used . . . ." (See Def.'s Post-Trial Mem. Ex. 1 at 5.)

Third, the channels of trade in which the Merchandise moved tend to bolster Plaintiff's

case. Here, the Merchandise was shipped empty from the supplier to the company that packed it with biscotti. See Kraft, 16 CIT at 489 ("Glass containers used for food products generally move through channels of trade which run directly from the manufacturer to the packing plant where the jars are used to pack food products."); see also T.D. 96-7, 30 Customs Bulletin at 33, 61 Fed. Reg. at 224. The Merchandise was not sold at wholesale for any purpose other than that of being used as a container for conveying or packing food. Nor was the Merchandise ever sold empty at retail, or offered for sale to the public unless packed with food. See Kraft, 16 CIT at 489 (finding it probative that "[t]hese glass containers are never sold directly to the consumer.").

Fourth, the environment in which the Merchandise packed with the biscotti was sold at retail favors Plaintiff's proposed classification. See Carborundum, 536 F.2d at 377 ("[T]he environment of the sale [includes] the manner in which the merchandise is advertised and displayed . . . ." (citation omitted)). Costco (the sole retailer) sold the Merchandise in its "seasonal gift aisle" where it was displayed for sale with other food items. The Merchandise was never displayed or sold in an area where empty glassware, kitchen, or storage containers were sold. See T.D. 96-7, 30 Customs Bulletin at 33, 61 Fed. Reg. at 228 (stating it to be indicative of merchandise properly classifiable under subheading 7010.91.50 that it is "sold in an environment of sale that features the goods packed in the jar and not the jar itself . . . ."). In addition, while there is no evidence that the Merchandise packed with biscotti was advertised, there is evidence that Acme—the company that chose to pack biscotti in the Merchandise rather than an opaque container—did so because the Merchandise was relatively unique and emphasized the frosting on the biscotti. As such, Acme hoped that consumers would respond to the uncommon shape of the

Merchandise and find it attractive for presentation as a gift.  In addition, by packing the biscotti

in the Merchandise with the frosting facing out and, thus, clearly visible through the glass to

consumers, it was hoped that consumers would be attracted to the food product itself.  See Kraft,

16 CIT at 489 ("Packaging plays a key role in the marketing of food products . . . [in that] the

packaging attracts the consumer's attention and is designed to increase sales of the food product

packed in the container.").

Fifth, the court in Carborundum found that the use to which merchandise is actually put is

probative of the class to which it belongs.  Carborundum, 536 F.2d at 377 (finding that the

subject merchandise was actually used in a different manner than the merchandise classifiable

under the particular tariff provision at issue); see T.D. 96-7, 30 Customs Bulletin at 33, 61 Fed.

Reg. at 224.  Here, it is undisputed that the Merchandise was actually used as a container into

which food was packed and conveyed.

Sixth, neither party introduced direct evidence as to the economic practicality of using the

Merchandise to convey food (although there was testimony that Acme selected the Merchandise

because it was "inexpensive").  Carborundum, 536 F.2d at 377; T.D. 69-7, 30 Customs Bulletin

at 33, 61 Fed. Reg. at 224.

Finally, neither party offered credible evidence as to whether the Merchandise would be

recognized by the trade as "Other containers, of glass, of a kind used for the conveyances or

packing of goods" under subheading 7010.91.50.  See Carborundum, 536 F.2d at 377, T.D. 69-7,

30 Customs Bulleting at 33, 61 Fed. Reg. at 224.

Thus, while the shape of the Merchandise may be different from that of other containers classifiable under heading 7010, these differences do not prevent the Merchandise from being so classified, see Kraft, 16 CIT at 488; (compare Pl.'s Trial Ex. 1, with Court Trial Exs. 1, 2), and the clear evidence adduced at trial supports the conclusion that the Merchandise is properly classified under 7010.91.50.

**CONCLUSION**

In accordance with the foregoing findings of fact and conclusions of law, the court finds that Plaintiff has overcome the presumption of correctness that attached to Customs' classification ruling under subheading 7013 by clearly establishing that the Merchandise is classifiable under heading 7010, and that the Merchandise is a glass container of a kind used for the conveyance or packing of goods and, thus, is properly classified under subheading 7010.91.50 of the HTSUS.  Judgment is entered accordingly.

_____
Richard K. Eaton, Judge

Dated:  October 5, 2002
       New York, New York