Slip Op. 03-2

## UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: Judge Judith M. Barzilay**

-------------------------------------------------- x

TOY BIZ, INC., :

                **Plaintiff,** : **Court No. 96-10-02291**

                v. :

UNITED STATES, :

                **Defendant.** :

-------------------------------------------------- x

[Plaintiff's Motion for Summary Judgment is granted and Defendant's Cross-Motion is denied with respect to classification of action figures and trading cards. Plaintiff's Motion for Summary Judgment is denied and Defendant's Cross-Motion is granted with respect to "Jumpsie."]

Decided: Jan 3, 2003

*Singer & Singh, (Sherry L. Singer*, *Indie K. Singh)*, for Plaintiff.

*Robert D. McCallum, Jr.*, Assistant Attorney General, United States Department of Justice; *John J. Mahon*, Acting Attorney in Charge, International Trade Field Office; (*Mikki Graves Walser*), Civil Division, United States Department of Justice, Commercial Litigation Branch; *Beth C. Brotman*, Attorney, Office of Assistant Chief Counsel, International Trade Litigation, United States Customs Service, of Counsel, for Defendant.

## OPINION

**BARZILAY, JUDGE:**

### I. INTRODUCTION

This is the fourth and final opinion for this Court in a case involving the tariff

classification of dozens of action figures from various Marvel Comics series. *See Toy Biz, Inc. v.*

*United States*, 26 CIT __, __, 219 F. Supp. 2d 1289 (2002) ("*Toy Biz III*"); 25 CIT __, __, 132 F.

Supp. 2d 17 (2001) ("*Toy Biz II*"); 24 CIT __, __, 123 F. Supp. 2d 646 (2000) ("*Toy Biz I*"). The legal issue presented in this case involves the construction of the "dolls" provision *vis a vis* the "other toys" provision. This issue was an historically contentious one[1] under the former classification scheme, the Tariff Schedules of the United States ("TSUS"), and this case presents an issue of first impression[2] under the Harmonized Tariff Schedule of the United States ("HTSUS") adopted by the United States in 1989. This court holds that, first, the change in language from the TSUS to the HTSUS with respect to the "dolls" and "other toys" provisions reflects a change in law; second, to be properly classifiable as a "doll" under the HTSUS, a toy figure must clearly represent a human being; third, the action figure playthings at issue here are not properly classifiable as "dolls" under the HTSUS by virtue of various non-human characteristics they exhibit; and finally, the item "Jumpsie" is properly classifiable as a "doll" under the HTSUS.

## II. BACKGROUND

Plaintiff Toy Biz, Inc. ("Toy Biz") brings this action to challenge the tariff classification by the United States Customs Service ("Customs" or "Defendant") of various items imported

---

[1] *See* discussion *infra* regarding the many cases construing the TSUS provisions, including *Hasbro Indus., Inc. v. United States*, 12 CIT 983, 703 F. Supp. 941 (1988), *aff'd*, 879 F.2d 838 (Fed. Cir. 1989) ("*Hasbro*").

[2] It may also be a case of last impression. The current action may have retrospective practical effect only. Although the most recent HTSUS (2002) retains the distinctions in the "toys" classifications, the court notes that all of the "toys" provisions including the "dolls" provision now have the same duty rate, that is, all "toys" are allowed to enter the United States duty-free. *See* HTSUS (2002) 9502 & 9503.

from China and entered at the ports of Seattle and Los Angeles in 1994.[3]  The items are action

figures from various Marvel Comics series, including the "X-Men," "Spider-Man," and the

"Fantastic Four," and an additional item called "Jumpsie," which is not an action figure.  The

items are packaged in boxes or blister packs attached to colorful cardboard backing covered with

printed illustrations and writing.  The packaging of a number of items includes small accessories,

such as weapons and other equipment.[4]  Customs classified the items as "Dolls representing only

human beings and parts and accessories thereof: Dolls whether or not dressed: Other: Not over

33 cm in height," under subheading 9502.10.40 of the HTSUS (1994), dutiable at 12% *ad*

*valorem*.[5]  Toy Biz contends that the action figures at issue are properly classifiable as "Toys

representing animals or other non-human creatures (for example, robots and monsters) and parts

and accessories thereof: Other," under subheading 9503.49.00, HTSUS (1994),[6] dutiable at 6.8%

---

[3] This case, Court No. 96-10-02291, has been designated a test case, under which four other cases, Court Nos. 96-05-01299, 96-05-01448, 96-05-01449, and 97-05-00744, have been suspended.  *See* Order signed on June 12, 1998.

[4] Contrary to Plaintiff's assertion, the inclusion of the weapons and such does not convert the items into "toy sets."  *See Pl.'s Mem. in Supp. of Mot. for Summ. J.* at 15 ("*Pl.'s Br.*").  These items are properly classifiable as "accessories" under the HTSUS "doll" or "toy" provisions because they are of subordinate value compared with the figures themselves and their inclusion with the figures is intended to enhance the play value of the figures.  *See* discussion *infra* regarding "accessory."

[5] *See* HQ 957636 (Oct. 11, 1995); HQ 957688 (Oct. 11, 1995); HQ 957603 (Oct. 12, 1995); HQ 958244 (Mar. 4, 1996); HQ 958039 (Mar. 8, 1996).

[6] In its entirety, HTSUS (1994) subheading 9503.49.00 reads: "Other toys; reduced-size ("scale") models and similar recreational models, working or not; puzzles of all kinds; parts and accessories thereof: Toys representing animals or non-human creatures (for example, robots and monsters) and parts and accessories thereof: Other."

*ad valorem*.[7]  Toy Biz further contends that "Jumpsie" should be classified as a "toy set," under

HTSUS (1994) subheading 9503.70.80, dutiable at 6.8% *ad valorem*.[8]

Customs further classified the trading cards, included in the packaging of the action

figures and which picture and describe other action figures (other than the one with which they

are included), separately under HTSUS (1994) subheading 4911.99-6000 as "Other printed

matter, including printed pictures and photographs: Other: Other: Other: Printed on paper in

whole or in part by a lithographic process," dutiable at 0.4% *ad valorem*.[9]  Plaintiff disputes the

separate classification of the trading cards.  *See Pl.'s Mem. in Supp. of Mot. for Summ. J.* at 15

("*Pl.'s Br.*").  Both parties have stipulated to the material facts and have filed motions for

---

[7] This Court previously rejected two alternative arguments of Toy Biz with respect to certain items.  Concerning a class of items referred to as "X-Men Projectors," Toy Biz had argued that they were alternatively classifiable as "toy sets," under subheading 9503.70.80, HTSUS.  In rejecting this argument, this Court specifically found that neither the projector mechanism housed in the figure nor the film disks packaged with the "X-Men Projectors" justify their classification as "toy sets."  *Toy Biz, Inc. v. United States*, 26 CIT __, __, 219 F. Supp. 2d 1289, 1302-03 (2002) ("*Toy Biz III*") (also holding that film disks are properly classified as "accessories").  Concerning another class of items called "X-Men Steel Mutants" and an additional item named "Silver Samurai" (in assortment 4900 I), Plaintiff had argued that they were the equivalent of "tin soldiers and the like" expressly included within the scope of HTSUS heading 9503 per Explanatory Notes to that heading and that they were therefore specifically precluded from being classified as "dolls."  Relying on the reasoning of *Hasbro*, this Court dismissed that argument because the items displayed unique and distinctive physical appearances and personalities.  *See Toy Biz, Inc. v. United States*, 25 CIT __, __, 132 F. Supp. 2d 17, 20-21 (2001) ("*Toy Biz II*").

[8] Subheading 9503.70.80 of HTSUS reads: "Other toys, put up in sets or outfits, and parts and accessories thereof: Other: Other."

[9] *See* HQ 957636 (Oct. 11, 1995); HQ 957688 (Oct. 11, 1995); HQ 957603 (Oct. 12, 1995); HQ 958039 (Mar. 8, 1996).

summary judgment pursuant to USCIT R. 56.[10]  The court has jurisdiction pursuant to 28 U.S.C.

§ 1581(a).

## II. SUMMARY JUDGMENT AND STANDARD OF REVIEW

This court may decide classification cases on summary judgment when it is appropriate.

*See Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1365 (Fed. Cir. 1998); *Ero Indus.,*

*Inc. v. United States*, 24 CIT __, __, 118 F. Supp. 2d 1356, 1359 (2000).  "The fact that both

parties have moved for summary judgment does not mean that the court must grant judgment as

a matter of law for one side or the other; summary judgment in favor of either party is not proper

if disputes remain as to material facts." *Mingus Constructors, Inc. v. United States*, 812 F.2d

1387, 1391 (Fed. Cir. 1987) (citation omitted).  Summary judgment is appropriate "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law."  USCIT R. 56(c).  "It is the function of the

---

[10] On October 18, 2000, the parties entered into a Stipulation identifying all items at issue in this action.  Later, with both parties' consent, Plaintiff withdrew from the case the items "Daredevil," "Invisible Woman," "Punisher," "U.S. Agent," and "Peter Parker," and Defendant agreed to classify the items "Beast," "Bonebreaker," "Cameron Hodge," "Robot Wolverine," and "Vulture" as "other toys," under subheading 9503.49.00 of the HTSUS.  *See* Letter from Attorney for Pl. (Mar. 9, 2001); Pl.'s Mot. to Withdraw Items from Case (Order signed by Judge Delissa A. Ridgway on March 27, 2001); Decl. of Alice Wong ¶ 3 (Apr. 5, 2001); Letter from Attorney for Def. (Apr. 6, 2001).  The parties agree that there is no dispute as to what the items in question are.  *See* Letter from Attorney for Def. (Nov. 18, 2002).  Moreover, the court has before it sufficient samples and pictures of the items in question which enable the rendition of a dispositive decision.  *Cf. Janex Corp. v. United States*, 80 Cust. Ct. 146, 148 (1978) ("samples are potent witnesses and have great probative effect respecting the purpose for which an article is designed").

court to determine whether there are factual issues that are material to resolution of the action."

*Ero Indus.*, 118 F. Supp. 2d at 1359 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)

and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In classification actions,

"summary judgment is appropriate when there is no genuine dispute as to . . . what the

merchandise is . . . or as to its use."  *Id.* at 1359-60.  When there are no factual issues in the case,

the "propriety of the summary judgment turns on the proper construction of the HTSUS, which

is a question of law," subject to *de novo* review.[11]  *Clarendon Marketing, Inc. v. United States*,

144 F.3d 1464, 1466 (Fed. Cir. 1998); *Nat'l Advanced Sys. v. United States*, 26 F.3d 1107, 1109

(Fed. Cir. 1994); *see also* 28 U.S.C. § 2640 (1994).  Here, the parties cross-moved for summary

judgment, stipulated to material facts, and submitted affidavits.[12]  No genuine issues of material

fact remain as to the nature of the merchandise or its use.  The items at issue are various

playthings for children, classifiable either as "dolls" or "other toys" under the HTSUS.  The only

remaining question is the proper scope of those classification provisions of the HTSUS, which is

---

[11] The court notes that in the absence of a Customs regulation interpreting the HTSUS provisions, Customs' tariff decision in an ordinary classification ruling is not entitled deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See United States v. Mead Corp.*, 533 U.S. 218, 231 (2001); *JVC Co. of Am., Div. of US JVC Corp. v. United States*, 234 F.3d 1348, 1351 (Fed. Cir. 2000).  Such rulings may, however, be upheld based on their "'power to persuade.'"  *Mead*, 533 U.S. at 235 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

[12] This Court previously rejected the parties' motions for summary judgment, finding that genuine issues of material fact remained in the application of the Customs' classification test (casual observer test) to this case and that the "parties do not agree on . . . material facts."  *See Toy Biz I* at 651 (2000).  Since then the parties have submitted affidavits to the court, *see* Aff. of JoAnn E. McLaughlin (May 24, 2001); Decl. of Alice Wong (April 5, 2001), and further solidified the list of the items at issue, *see* Letter from Attorney of Def. (Nov. 18, 2002) (confirming Stipulation dated October 18, 2000 and the items disposed of since then), which have resolved earlier issues of material fact.

a question of law. Accordingly, a grant of summary judgment for either side, based on pleadings and supporting documents, is appropriate.

### III. DISCUSSION

"The proper classification of merchandise entering the United States is directed by the General Rules of Interpretation ("GRIs") of the HTSUS and the Additional United States Rules of Interpretation." *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1439 (Fed. Cir. 1998). "The HTSUS scheme is organized by headings, each of which has one or more subheadings; the headings set forth general categories of merchandise, and the subheadings provide a more particularized segregation of the goods within each category." *Id.* Under GRI 1, "[a] classification analysis begins, as it must, with the language of the headings." *Id.* at 1440. GRI 1 states in pertinent part "classification shall be determined according to the terms of the headings and any relative section or chapter notes." "[T]he other GRI provisions may be consulted only if headings and notes 'do not otherwise require' a particular classification." *Mita Copystar Am. v. United States*, 160 F.3d 710, 712 (Fed. Cir. 1998) (quoting GRI 1). If a subheading is at issue, "[f]or legal purposes, the classification of goods in the subheadings of a heading shall be determined according to the terms of those subheadings and any related subheading notes and, *mutatis mutandis*, to" the other GRIs. GRI 6, HTSUS.

The "proper scope of a classification in the HTSUS is an issue of statutory interpretation." *Bauerhin Techs. Ltd. P'ship v. United States*, 110 F.3d 774, 776 (Fed. Cir. 1997). "It is a general rule of statutory construction that where Congress has clearly stated its intent in the language of the statute, a court should not inquire further into the meaning of the

statute." *Pillowtex Corp. v. United States*, 171 F.3d 1370, 1373 (Fed. Cir. 1999) (citation omitted). If "statutory language of [a] tariff classification is ambiguous," the court may use various "aids in construing the statute and disclosing legislative intent." *Celestaire, Inc. v. United States*, 20 CIT 619, 623, 928 F. Supp. 1174, 1178 (1996) (citation omitted). Among such aids are "standard canons of statutory construction [or] legislative ratification of prior judicial construction." *Id.* (citations omitted). Additionally, the court may construe HTSUS terms "according to their common and commercial meaning" if such construction would not contravene legislative intent. *JVC Co. of Am., Div. of US JVC Corp. v. United States*, 234 F.3d 1348, 1352 (Fed. Cir. 2000) (citation omitted); *see also John S. James A/C The Consol. Packaging Corp. v. United States*, 48 C.C.P.A. 75, 77 (1961) ("it is incumbent upon [the court] to assume that Congress attributed to the words their common meaning unless the evidence or some other factor indicates otherwise"). "A court may [also] rely upon its own understanding of the terms used, lexicographic and scientific authorities, dictionaries, and other reliable information." *JVC*, 234 F.3d at 1352. Finally, "a court may refer to the Explanatory Notes of a tariff subheading, which do not constitute controlling legislative history but nonetheless are intended to clarify the scope of HTSUS subheadings and to offer guidance in interpreting subheadings." *Mita Copystar Am. v. United States*, 21 F.3d 1079, 1082 (Fed. Cir. 1994) (citation omitted).

Here, Customs classified the items under HTSUS heading 9502, "Dolls representing only human beings and parts and accessories thereof." Basing its contention on the wording of HTSUS 9502, Toy Biz argues that to be classifiable as a "doll," the "item must represent only, i.e., exclusively, a human being." *Pl.'s Br.* at 5 (emphasis in original). Toy Biz points to the

tentacles, claws, wings or other non-human features that a number of the items at issue possesses. *Id.* Toy Biz thus concludes that the items at issue are not classifiable as "dolls" because "the figures represent creatures other than humans, and possess features characteristic of non-humans." *Id.*

Toy Biz next argues that the items are properly classifiable as "Toys representing animals or non-human creatures (for example, robots and monsters)" under subheading 9503.49.00, by virtue of possessing non-human features. *See id.* at 6-7. Toy Biz observes that the Explanatory Note 95.03(A)(1) provides that "other toys" under heading 9503 include "[t]oys representing animals or non-human creatures even if possessing predominantly human physical characteristics (e.g. angels, robots, devils, monsters)." *Id.* at 5-6. According to Toy Biz, the Explanatory Notes thus add to the list of creatures that should be considered non-human (angels and devils) and emphasize that the item should be considered non-human even if predominantly human in physical appearance. Toy Biz would frame the classification issue as "not whether the character has some human features, or even whether the character resembles a human being," but "whether the figure represents only a human being." *Id.* at 7 (emphasis in original).

Customs answers this argument by first observing that "[h]eading 9502 is an *eo nomine* provision for 'dolls.'" *Def.'s Mem. in Supp. of Cross-Mot. for Summ. J. and in Opp. to Pl.'s Mot. for Summ. J.* at 18 ("*Def.'s Br.*"). Customs explains that "[i]n the absence of contrary legislative intent, **an *eo nomine* provision includes all forms of the article**." *Id.* at 18-19 (emphasis in the original) (citing *Nootka Packing Co. v. United States*, 22 C.C.P.A. 464 (1935)

and *Hasbro Indus., Inc. v. United States*, 879 F.2d 838 (Fed. Cir. 1989)).[13]  According to

Customs, "[h]eading 9502 is, therefore, an *eo nomine* provision covering all forms of dolls which

represent human beings." *Def.'s Br.* at 19 (citation omitted).  In explaining its interpretation of

"dolls," Customs relies primarily on case law that in turn relied on dictionary definitions for the

term "doll."  *Id.*  For example, the Court in *Hasbro Indus., Inc. v. United States*, found that "the

dictionaries referred to by the Court invariably define[d] the word doll as a representation of a

human being used as a child's plaything" and declared that "[t]his, in itself, is virtually decisive."

12 CIT 983, 988, 703 F. Supp. 941, 945 (1988), *aff'd*, 879 F.2d 838 (Fed. Cir. 1989).  Customs

further observes that so far "judicial decisions interpreting the term 'dolls,' without exception,

have broadly construed the scope of that term to include a broad range of physical characteristics

and a wide variety of uses." *Def.'s Br.* at 20 (citations omitted).  Thus, since the figures at issue

all have "the appearance of human beings" by virtue of having "a head, mouth, eyes, nose, hair,

arms, torso, breasts, muscles, and [with one exception] legs and feet;" are "noticeably lifelike

and constructed in a manner which permits an impressive range/simulation of human

movement;" are "dressed as human beings and equipped with weapons and accessories in a

manner associated with actual or fictional warfare;" and finally possess "such human

characteristics as gender, race, physical impediment/handicap, and nationality,"[14] according to

---

[13] Even though Customs cites pre-HTSUS cases for this proposition, the court notes that an *eo nomine* provision still "includes all forms of the article" under the HTSUS.  *See Nidec Corp. v. United States*, 68 F.3d 1333, 1336 (Fed. Cir. 1995).

[14] Customs points out, for example, "Professor X" being featured in a wheel chair, "Silver Samurai" being a "Japanese action figure," "Bishop" being "a black man," and "Rogue" being "a female action figure." *Def.'s Br.* at 22.

Customs, they fall under "the *broad* definition of the tariff term 'dolls.'" *Id.* at 21-22 (emphasis

added). Finally, Customs argues that the few non-human characteristics the figures possess,

such as claws or robotic arms, "fall far short of transforming [these figures] into something other

than the human beings which they represent." *Id.* at 23.[15]

The construction of the HTSUS provision "dolls" *vis a vis* the HTSUS provision of

"other toys" is a case of first impression.[16] In defending its classification of the figures at issue

as "dolls," Customs primarily relies on the case law that interpreted the classification of "dolls"

under the TSUS and previous case law. *See, e.g., Hasbro,* 879 F.2d at 838 (classification as

"dolls" under TSUS); *Am. Imp. Co. v. United States*, 22 Cust. Ct. 51 (1949) (classification as

"dolls" under paragraph 1513 of Tariff Act of 1930). Prior to the HTSUS, the tariff

---

[15] In framing its arguments, Customs first contends that Toy Biz has "not met its burden of establishing that its claimed classification provisions are correct, independently or in comparison to the decisions made by Customs." *Def.'s Br.* at 17. Customs cites 28 U.S.C. § 2639(a)(1), which provides that Customs' tariff classifications are "presumed to be correct" and the "burden of proving otherwise shall rest upon the party challenging such decision." However, the court notes that that presumption, as it relates to evidence, "carries no force as to questions of law." *Universal Elecs. Inc. v. United States*, 112 F.3d 488, 492 (Fed. Cir. 1997). "[W]here . . . a question of law is before the Court on a motion for summary judgment, the statutory presumption of correctness is irrelevant." *Blakley Corp. v. United States*, 22 CIT 635, 639, 15 F. Supp. 2d 865, 869 (1998); *see also JVC Co. of Am., Div. of US JVC Corp. v. United States*, 23 CIT 523, 527, 62 F. Supp. 2d 1132, 1136 (1999), *aff'd*, 234 F.3d 1348 (Fed. Cir. 2000). Accordingly, since the interpretation of the scope of the HTSUS provisions at issue here is a question of law presented on cross-motions for summary judgment, Customs' interpretation of those provisions will not be presumed correct.

[16] In two other cases that involved the HTSUS "doll" classification, the alternative classification was different than the classification of "other toys." *See Club Distribution, Inc. v. United States*, 20 CIT 839 (1996) ("other articles for Christmas festivities under subheading 9505.10.50, HTSUS"); *Midwest of Canon Falls, Inc. v. United States*, 20 CIT 123, 128 (1996), *aff'd in part and rev'd in part*, 122 F.3d 1423 (Fed. Cir. 1997) ("Christmas ornaments made of wood under subheading 9505.10.15, HTSUS" and "Christmas ornaments other than those made of wood or glass under subheading 9505.10.25, HTSUS").

classification for "dolls" had always been broadly construed. *See Russ Berrie & Co., Inc. v. United States*, 417 F. Supp. 1035, 1039-40 (Cust. Ct. 1976) (listing items previously classified as dolls including "dolls for display or advertising purposes, and dolls sold as gag items, bar gadgets, adult novelties, etc., . . . [s]mall woven rush figures made in Mexico, consisting of a horse and rider and a figure of a woman made of straw, [a dancing female figure affixed to] a music box, [and a] papier-mache Hawaiian hula girl [used in] a car as a decorative item") (citations omitted); *see also R. Dakin & Co. v. United States*, 14 CIT 797, 798, 752 F. Supp. 483, 484 (1990) (holding that "a puppet-like toy made up of a doll head and hands attached to a sleeve of bunting" is properly classified as "doll" under TSUS); *Hasbro,* 879 F.2d at 841 (affirming CIT holding that G.I. Joe action figures are "dolls"); *Wregg Imps. v. United States*, 10 CIT 679, 682 (1986) (affirming Customs classification of "matreshkas" as "dolls"). Previous judicial and Customs determinations interpreting TSUS provisions are not "dispositive" in interpreting the HTSUS provisions. H.R. Conf. Rep. No. 100-576, at 549 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1548, 1582. However, "on a case-by-case basis prior decisions should be considered instructive in interpreting the [HTSUS], particularly where the nomenclature previously interpreted in those decisions remains unchanged and no dissimilar interpretation is required by the text of the [HTSUS]." *Id.* at 549-50.

The TSUS "dolls" classification heading reads "Dolls, and parts of dolls including doll clothing."[17] TSUS Schedule 7, Part 5, Subpart E (1987). HTSUS heading 9502 reads "Dolls

---

[17] In the TSUS, the "dolls" provision is in Subpart E ("Models; Dolls, Toys, Tricks, Party Favors") of Part 5 ("Arms and Ammunition; Fishing Tackle; Wheel Goods; Sporting Goods, Games and Toys") of Schedule 7 ("Specified Products; Miscellaneous and Nonenumerated Products"). The TSUS "dolls" provision is subdivided into "Doll clothing imported separately,"

*representing only human beings* and parts and accessories thereof" (emphasis added).  HTSUS

heading 9502 thus represents a definite change in the nomenclature of the "dolls" provision from

the TSUS.  It is a well-established maxim in statutory construction that, if there is a change in the

statutory language, the court is to assume that  "the change was not made by accident, but that it

was intentional, and that by making such a change in expression Congress used the term in a

different sense from that in which the former expression was used."  *Stroheim & Romann v.*

*United States*, 13 Ct. Cust. App. 489, 493 (1926).  "This rule is, however, not absolute, and does

not compel the conclusion that a change in meaning was meant."  *Id.*  "It merely *indicates* such

an intention."  *Id.* (emphasis in the original).  Here, the change in the language of the tariff

classifications at a minimum indicates an intention to change their meanings.  Accordingly, this

court observes that pre-HTSUS interpretations of the "dolls" provision (by the courts and

Customs) can no longer direct the interpretation of HTSUS heading 9502.  Such pre-HTSUS

interpretations may only inform the court's interpretation of HTSUS heading 9502.

The first issue before the court is whether the addition of the clause "representing only

human beings" in the HTSUS constricts the "dolls" tariff classification previously interpreted

broadly.[18]  The second issue before the court is whether, if the "dolls" provision is indeed

---

737.17, TSUS, and "Other: Dolls," 737.18-25, TSUS.  The TSUS "toys" provisions are found in
737.28-55, TSUS.  The TSUS headings for "toys" read "Toy figures of animate objects (except
dolls)" and "Toy figures of inanimate objects, . . . ."

[18] The "dolls" provision continues to be broadly construed in the sense that it "includes
not only dolls designed for the amusement of children, but also dolls intended for decorative
purposes (e.g., boudoir dolls, mascot dolls), or for use in Punch and Judy or marionette shows, or
those of a caricature type."  Explanatory Note 95.02, HTSUS.  Further, dolls can be made of a
variety of materials, such as "rubber, plastics, textile materials, wax, ceramics," etc.  *Id.*  In any
event, the issue here is not the "broadness" of the "dolls" provision with respect to uses of dolls

narrower, the action figures in question would nevertheless be encompassed by HTSUS heading

9502 instead of the alternative HTSUS heading 9503 for "other toys." Only after determining

the proper heading may the court inquire into the propriety of HTSUS subheading 9503.49.00

"Toys representing animals or non-human creatures (for example, robots and monsters) and parts

and accessories thereof" as the tariff classification of the items in question. *See* GRI 1 & 6,

HTSUS.

The court first recognizes that the 9503 "other toys" provision of the HTSUS is a residual

or a default provision. Both the 9502 "dolls" and the 9503 "other toys" provisions appear in

Chapter 95 of the HTSUS, titled "Toys, Games and Sports Equipment; Parts and Accessories

Thereof." The first heading, 9501, is reserved for "[w]heeled toys designed to be ridden by

children;" heading 9502, for "dolls;" and heading 9503, for "other toys." The Explanatory Note

95.03 to heading 9503 explicitly states that the "other toys" provision includes *all* toys not

included in 9501 and 9502. Thus, heading 9503 is a default provision intended to encompass all

toys that are not "wheeled toys" or "dolls." Accordingly, when the choice is between the "dolls"

and "other toys" provisions of the HTSUS, the construction of the provisions must start with that

of "dolls."[19] The construction of the "dolls" provision may not, however, render either the "other

---

or the materials they are made of. Also, not at issue here is how much detail a doll must have
and in what form a doll must be to represent a human being. *Cf., e.g.*, *Wregg Imps. v. United
States*, 10 CIT 679, 682 (1986) (affirming Customs classification of nested "matreshkas" as dolls
even though they are egg-shaped with human features drawn on wood)

[19] Moreover, the observation that the "other toys" provision is a residual provision
compels the conclusion that the "dolls" and "other toys" classifications are mutually exclusive.
Therefore, the items are not *prima facie* classifiable under both provisions and GRI 3 is thus not
pertinent to the analysis here. *Cf.* GRI 3(a), HTSUS ("When, . . . for any . . . reason, goods are,
*prima facie*, classifiable under two or more headings, classification shall be affected as follows:

toys" provision or any other provision of the HTSUS meaningless and lead to ambiguous and contradictory results.[20]  It is therefore necessary to interpret the "dolls" provision in the context of the entire Chapter 95 and especially in relation to the "other toys" provision.

The task of the court is to ascertain which meaning the words "representing" and "only" were intended to carry in the phrase "dolls representing only human beings" in heading 9502 of the HTSUS.[21]  The question regarding the word "only" is answered more readily.  The court agrees with Toy Biz that one of the primary meanings of the term "only" is "exclusively."  The Oxford English Dictionary ("OED") provides referring to the adverb "only": "1.  As a single or solitary thing or fact; no one or nothing more or else than; nothing but; alone; solely, merely, *exclusively*."  10 OED at 818 (2d ed. 1989) (emphasis added).  The OED further provides that "only" limits the word it precedes, for example, in a way that produces the connotation "as opposed to any *other*."  *See id.* (emphasis in the original).  Therefore, the heading "dolls representing only human beings" can be read as "dolls representing human beings, as opposed to any *other* beings."

The meaning of the term "representing" in heading 9502 is harder to ascertain.  Toy Biz urges that "to represent" in this context means more (or other) than "to resemble."  *See Pl.'s Br.*

---

(a) The heading which provides the most specific description shall be preferred to headings providing a more general description.").

[20] The plain meaning rule of statutory construction dictates that "when results flowing from an apparently plain meaning of a statute are ridiculous, absurd, or manifestly unjust, or will have the effect of rendering some other plain provision of the statute nugatory, it will not be presumed that the lawmaking body so intended, and further inquiry may be had."  *United States v. Palm, Fechteler & Co.*, 4 Ct. Cust. App. 1, 2 (1913).

[21] There is no definition for these terms in the HTSUS.

at 7.[22] The court agrees. The reason is multi-fold. First, consulting the OED, the court finds that "to resemble" is only one of the many possible meanings of "to represent." 13 OED at 657-58. In the senses more pertinent to our purpose here, "to represent" may, for example, mean "to show, exhibit, or display to the eye," "to portray, depict, delineate," "to symbolize, to serve as a visible or concrete embodiment of," "to stand for or in place of," "to be the figure or image of," "to take or fill the place of," or "to serve as a specimen or example of" a person or a thing. *Id.* Second, given the entire context of the HTSUS, "to represent" in "dolls representing only human beings" must mean something more than (or other than) "to resemble." In other words, one cannot read the "dolls" provision as meaning exclusively "dolls *resembling* human beings." This reading of the "dolls" provision would create ambiguity and conflict with the "other toys" provision of the HTSUS. One of the subheadings at issue here reads "Toys representing animals or non-human creatures (for example, robots and monsters)." The accompanying Explanatory Note 95.03, HTSUS, further explains that "[t]hese include: (1) Toys representing animals or non-human creatures *even if possessing predominantly human physical characteristics*" (emphasis added). Thus, the "other toys" provision clearly encompasses toys that possess predominantly human physical characteristics, i.e. resemble human beings. If "to represent" in "dolls representing only human beings" meant exclusively "to resemble," a toy that merely resembled a human being would be *prima facie* classifiable under both the "dolls" and "other toys" provisions. The HTSUS scheme, however, prevents this interpretation. As explained above, *see*

---

[22] Elsewhere, Customs draws a similar distinction between "to represent" and "to resemble." In holding that "troll" figures are not classifiable as "dolls," Customs specifically noted that even though certain troll figures may *resemble* human beings, they do not *represent* human beings. *See* HQ 089895 (Nov. 4, 1991).

*supra* note 19 and accompanying text, the "dolls" and the "other toys" provisions are mutually

exclusive; and an item cannot be classified as both a "doll" and "other toy."

The court next considers what the effect these interpretations of "only" and "to represent"

have on the "dolls" provision that reads "dolls representing only human beings." To be

classified as a "doll" under the HTSUS, a toy needs to be an "embodiment" of a human being or

to serve as an "example" of a human being. This condition is more restrictive than merely to

resemble a human being. The word "only" further restricts the provision because it will not

allow the representation of any being other than a human being to be classified as a "doll." The

court thus concludes that by excluding toys that do not exclusively represent human beings

(however much they resemble human beings), the HTSUS "dolls" provision has indeed

narrowed the scope of what can be classified as "dolls" when compared with the TSUS "dolls"

provision which simply read "Dolls, and parts of dolls including doll clothing," and was not

restricted by any qualifiers.[23]

---

[23] The court notes that for over a decade Customs has employed a test, called the "casual observer" test, to differentiate between the "dolls" and "other toys" provisions of the HTSUS. *See* HQ 086088 (Feb. 21, 1990). The same test was applied to the items in question here. This court's task is to construe the tariff provisions at issue and to determine which provision properly encompasses the items presented here. Therefore, it is appropriate for the court to examine Customs' application of the "casual observer" standard as gleaned from Customs' published rulings. The "casual observer" standard is described as eliminating the need to closely evaluate toy figures to determine their non-human characteristics. *See id.* The court notes that this description seems to be honored more in the breach and that the word "casual" may be misleading. Customs claims that it should not be necessary to closely examine the item to determine its non-human characteristics and that "[t]he phrase 'close examination' may encompass the need to look closely, the need to remove the clothes of the figure, or perhaps even the need of the observer to guess as to whether a feature that appears to be non-human is, in actuality, such a feature." *Id.* However, and in fact, close examinations seem to be regularly performed when Customs makes such determinations. *See, e.g., id.* (Customs describing the figure "Gloriana" in detail and observing that the "only non-human characteristic" of the figure

The court next considers whether the items at issue here are properly classifiable as "dolls" under the HTSUS. The action figures at issue[24] are organized by Toy Biz in various assortments. The figures in assortments numbered 4900 I, 4900 J, 4900 K, 4900 F, 4900 G, and 4900 H are five-inch poseable (or capable of standing erect with movable joints) plastic figures, collectively referred to "X-Men" action figures.[25] *See* Stipulation (Oct. 18, 2000). Similarly, the figures in assortments 4950 E, 4950 F, and 4950 C are five-inches tall, made of plastic with movable joints, and are referred to as "X-Force" action figures. Assortments 49500 and 49710 in turn consist of ten-inch poseable plastic action figures, referred to also as "X-Force" or "X-Men." In addition, there are "X-Men Steel Mutants" that come in assortments 49210 and 49220 and are replicas of figures found in other "X-Men" or "X-Force" assortments. The "X-Men Steel Mutants" are packaged in pairs; as, for example, "Professor X vs. Magneto."[26] These

---

is a "set of small wings attached to the cloth at her back," which "can be easily removed from the figure without causing damage to the basic item," and that they, "even from the rear, are not easily recognizable as wings," in making the determination that the figure is properly classifiable as a "doll"). Indeed, the court itself by necessity undertook similar comprehensive examinations when determining the correct classification of the items at issue in this case. *See* discussion *infra*. The classification decision must be a carefully considered one and so long as Customs performs the casual observer test as it has done in the past it need not perform, pursuant to this opinion, any examination stricter. When it is readily apparent to a "casual observer" that a toy item (given its equipment, accessories, costumes, general appearance, and packaging) does not represent a human being, a "doll" classification is not warranted under the HTSUS.

[24] The item known as "Jumpsie" is not an "action figure." *See* discussion *infra* regarding "Jumpsie."

[25] Customs agreed to classify "Beast" and "Robot Wolverine" in Assortment 4900 I and "Bonebreaker" and "Cameron Hodge" in Assortment 4900 J as "other toys." *See* Letter from Attorney for Def. (April 6, 2001).

[26] The fact that these items are packaged in pairs has no bearing on their classification. The court rejects the position that when two or more toys are merely packaged together, the resultant product is a "toy set" under HTSUS 9503.70. *But see* Aff. of JoAnn E. McLaughlin at

figures are approximately two and a half inches tall, made of die-cast metal, fully painted, and

again have movable joints. Also packaged in pairs (with an additional smaller figure included)

are the so-called "Kay-Bee Collectors Editions," assortments 49605-I and 49605-II, which

consist of five-inch "X-Men" figures already found in other assortments.[27] Included among the

"X-Men" figures is "Senyaka," Toy Biz Item No. 49389, which is again a five-inch poseable

plastic figure. Finally, a class of figures referred to as "X-Men Projectors" (assortment no.

49110) are seven-inch replicas of the "X-Men" figures of "Wolverine," "Magneto," and

"Cyclops" included in other assortments with the addition of a mechanical "projector" housed in

the body of the figure.[28] The "X-Men Projectors" come with "film disks" with strips of frames

from the "TV Show" which can be projected onto a wall from the body of the figure.[29] All these

---

10 (May 24, 2001). There have been no cases so far that construed HTSUS 9503.70. Customs, on the other hand, notes that while "some components [of a toy set] may be used independently of the rest . . . without disqualifying the classification[, . . .] integral to that concept is that the articles 'typically' are used together to provide amusement [and that] it is sufficient that the components of the toy set possess a clear nexus which contemplates a use together to amuse." HQ 962327 (June 23, 2000) (quotation omitted). While here the pairing of, for example, "Professor X" and "Magneto" may have been to communicate their opposing positions in the "X-Men" storyline, this fact alone is insufficient to convert such a combination into a "toy set." While it may not be random, such a combination is not intended to create something different than what the figures themselves stand for on their own.

[27] Assortment 49605-II consists of "Silver Samurai v. Robot Wolverine" with a smaller "Cyclops" figure included. Customs already agreed to classify "Robot Wolverine" as "other toy" under HTSUS 9503.49.00. *See* Letter from Attorney for Def. (April 6, 2001).

[28] The court notes that it does not have samples of all of these "X-Men Projectors." The court, however, has samples of the figures themselves from the other assortments and samples "Bishop Projector" and "Dr. Octopus Projector" to illustrate the projection mechanism, all of which is sufficient to visualize the "X-Men Projectors" at issue.

[29] Previously, this Court found that the "X-Men Projectors" are not "toys sets" under HTSUS subheading 9503.70.80. *See Toy Biz III* at 1302-03. Thus, with respect to "X-Men Projectors," the remaining issue is the same as with other "X-Men" figures, that is, whether or

"X-Men" (or "X-Force") figures manifest human characteristics at varying degrees. Some clearly resemble human beings, some clearly not. Most are on the borderline in that they exhibit a mix of human and non-human characteristics, such as arms and legs alongside non-human features (for example, one of the more popular figures of the series "Wolverine" has long, sharp-looking claws grafted onto his hands that come out from under his skin along with wolf-like hair and ears).

Whatever the degree is to which they resemble human beings, the court finds that these action figures do not represent human beings and are therefore not properly classifiable as "dolls" under HTSUS heading 9502. The court bases its finding on at least three observations. First, most of the figures at issue exhibit at least one non-human characteristic. The court does not agree with Customs that the few non-human characteristics the figures possess, such as claws or robotic eyes, "fall far short of transforming [these figures] into something other than the human beings which they represent" because the issue under the HTSUS is not a straight headcount of the human features a figure may possess, rather the issue is whether the figure as a whole and in a wider context represents a human being. *See Def.'s Br.* at 23. Moreover, under the more restrictive "dolls" provision of the HTSUS, even one non-human feature the figure

---

not they represent human beings to be classified as "dolls," and, if not, whether they are to be classified as "toys representing animals or non-human creatures." The *Toy Biz III* court also held that "the existence of the projector component alone is [in]sufficient to warrant the Projectors' classification as 'other toys.'" *Toy Biz III* at 1302. This court agrees with the *Toy Biz III* court on this point, yet the court still finds that the "X-Men Projectors" are properly classifiable as "other toys" for different reasons.

possesses prohibits its classification as a "doll."[30]

Second, these Marvel characters are known in popular culture as "mutants." That fact further informs their classification. *Cf., e.g.*, HQ 950200 (Dec. 18, 1991) (Customs recognizing that some knowledge from popular culture is necessary to identify certain figures, such as angels, devils, monsters, as "non-human"). They are more than (or different than) humans. These fabulous characters use their extraordinary and unnatural physical and psychic powers on the side of either good or evil.[31] The figures' shapes and features, as well as their costumes and accessories, are designed to communicate such powers. For example, "Storm" (a tall and thin figure with white mane-like hair and dark skin) in assortment 4900 K has a lightening bolt as an accessory, reflecting the character's power to summon storms at will. "Rictor" in assortment 4950 E which has a human appearance but comes with a built-in wheel in the back which when turned makes the figure vibrate and thus is designed to simulate Rictor's "power to generate earthquake-like vibrations." "Pyro" in assortment 4950 E has a costume that, with two long hoses attached to it, is designed to aid the character's "mutant ability to control and shape

---

[30] By the same token, an angel figure, for example, may have all of the human features, except a pair of wings on its back (which may or may not be visible to an observer from the front), yet not be a "doll" under the HTSUS. *See* NY 894669 (Mar. 2, 1994) (Customs denying doll classification to an angel toy because "despite having an obvious human appearance, . . [the toy] possesses an apparent non-human feature, large transparent wings").

[31] The back of the packaging for the duo "Professor X vs. Magneto" tells the story in synopsis:

> Both Professor Charles Xavier and his friend Magnus agreed that an upsurge in mutant activity had begun – what they couldn't agree on is how mutants and normal humans could co-exist. Believing that mutants must rule, Magnus became Magneto, the evil master of magnetism. To combat him, the telepathic Professor-X formed the X-Men, a group that would represent his dream of human-mutant cooperation!

flames."[32]

Third, the "X-Men" figures are marketed and packaged as "mutants" or "people born with 'x-tra' power." That they are denoted as such by the manufacturer or the importer lends further credence to the assertion that they represent creatures other than (or more than) human beings. *See R. Dakin & Co. v. United States*, 14 CIT 797, 801, 752 F. Supp. 483, 486 (1990) (noting that "the importer's own consistent reference to the subject merchandise [by name] *is* a factor–albeit not the only one–to be considered for tariff classification purposes") (emphasis in the original); *Dan-Dee Imps., Inc. v. United States*, 7 CIT 241, 246 (1984) (finding reference to article on packaging by a particular name a "significant" factor).[33] For all the foregoing reasons, the "X-Men" and "X-Force" figures considered are not properly classifiable as "dolls" under HTSUS heading 9502.

If these figures are not "dolls" under HTSUS heading 9502, then they must fall into the category of "other toys" under HTSUS heading 9503. *See* Explanatory Note 95.03, HTSUS.[34]

---

[32] In the rare instances that a figure seems to exhibit no non-human characteristics, its "mutant" nature is communicated otherwise. For example, "Longshot" in assortment 4900 F looks like a young man with blond long hair who is equipped with knives, and wears unusual clothing. Longshot has extraordinary abilities at par with the other "X-Men" figures (as provided for on its packaging):

> Once a slave to the extradimensional tyrant Mojo, Longshot eventually escaped, came to Earth and joined forces with the X-Men. Armed with razor-sharp throwing knives, his combined abilities of amazing agility and incredible luck allow him to take on the fiercest foes.

[33] The court does not wish to imply that any toy designated by the manufacturer/importer as "non-human" can escape the "doll" designation under the HTSUS. Here, the figures are not merely packaged as such, but known to anybody familiar with the Marvel Comics characters as "mutants."

[34] Any toy not classifiable as a "doll" or a "wheeled toy" falls under the "other toys" category. It goes without saying that these items are not "wheeled toys;" nor is such an

After determining the proper heading, the court may next inquire under which subheading the items are properly classifiable.  *See* GRI 1 & 6, HTSUS.  In particular, this court finds that the action figures at issue are properly classifiable under HTSUS subheading 9503.49.00, "Toys representing animals or non-human creatures (for example, robots and monsters) and parts and accessories thereof."  A number of the figures exhibit likenesses to robots or monsters.  For example, they have robotic features, such as artificial eyes or limbs, or monster-like features, such as exaggerated muscle tone and large, sharp-looking teeth.  *Cf. Minnetonka Brands, Inc. v. United States*, 24 CIT __, __, 110 F. Supp. 2d 1020, 1029 n.5 (2000) (finding that the containers in the shape of the well-recognized children's character "Ernie" is properly classifiable under HTSUS 9503.49.00 rather than as plastic bottles because "Ernie's cartoon-like figure, orange complexion, red button nose, and oval head [is] a sufficient basis for finding him a 'non-human creature'").

More importantly for the purposes here, the category "mutants" is like the categories of "robots" or "monsters."  The categories of "robots," "monsters," and "mutants" are all, even if humanoid, extra-human (or non-human) categories of being.  A "robot" is a "machine (sometimes resembling a human being in appearance) designed to function in place of a living agent."  14 OED at 7.  A "monster" is "[s]omething extraordinary or unnatural; a prodigy, a marvel."  9 OED at 1036-37.  A "mutant" is an "individual (or, formerly, a species or form) which has arisen by or undergone mutation, or which carries a mutant gene (in *Science Fiction*, usu[ally] an individual with freak or grossly abnormal anatomy, abilities, etc.)."  10 OED at 145-

interpretation urged.

46. The first meaning of "mutation" is the "action or process of changing; alteration or change in form or qualities." *Id.* at 146-47. Thus, a "mutant" is someone (possibly originally belonging to human species) who has undergone change and become something other than human. Especially, in science fiction, a "mutant" is someone with an extraordinary appearance or abilities, such as the figures at issue here. Since HTSUS subheading 9503.49.00 leaves open the set of those that can be classified as "toys representing animals or non-human creatures (for example, robots and monsters)," it is clear that the intention was to include other categories of non-human creatures that are not necessarily enumerated in the subheading. Thus, to include "mutants" under this subheading is perfectly appropriate.

The court next turns to the more difficult classification of the action figures referred to as "Fantastic Four." The assortment 45100 is comprised of the "Fantastic Four" action figures "Black Bolt," "Mole Man," "Terrax," "Mr. Fantastic," and "Silver Surfer." The plastic figures are five-inch tall, poseable, and humanoid in shape. On their packaging, the characters are not referred to as "mutants" or are not known in popular culture as "mutants." They are, however, known to have extraordinary, "super-human" abilities. "Mr. Fantastic" is the "leader of the super-human quartet known as the Fantastic Four," as described on the "Mr. Fantastic" figure's packaging. The character can "stretch himself into almost any shape." Accordingly, the "Mr. Fantastic" figure has stretchable arms made of soft plastic. "Black Bolt," despite resembling a human, has wings attached to its arms and is described as belonging to "Inhumans." "Terrax" has a grey skin color signifying that the character's body is made of a "living stone-like substance." "Silver Surfer," although once human, has been transformed by "the power cosmic," and the figure's entire body along with its surfboard is consequently metallic.

Accordingly, the court finds that the four "Fantastic Four" figures considered above do not represent human beings and are thus not classifiable as "dolls" under HTSUS heading 9502. They are properly classifiable as "toys representing animals or non-human creatures (for example, robots and monsters)," under HTSUS subheading 9503.49.00. The last figure in this series is truly a close call. "Mole Man" is described as both being human and having an "odd appearance, . . . extraordinary intelligence, cunning, and fighting prowess with his staff."[35] The figure is stout and thick, has exaggerated troll-like features, wears a green outfit and cape, and comes with a staff and a small figure of a "humanoid" creature (yellow in skin with protruding white eyes) symbolizing the fact that the character uses small humanoid creatures to "do his bidding." Mole Man lives "within the Earth," and consistent with the character's subterranean nature, the figure has unusually pale skin and wears blue glasses. The character also "controls a legion of giant monsters." Given the entire context of the figure's appearance and fantastic story, and the fact that it is part of a series where the characters are described as "super-human," the court finds that "Mole Man" is also not properly classifiable as a "doll" under the HTSUS and instead should be classified as an "other toy" under HTSUS subheading 9503.49.00.

The court next considers the items collectively referred to as "Spider-Man" action figures, two of which also pose more difficult determinations than the mutant figures of the "X-Men" series. "Spider-Man" action figures come in assortments numbered 47100, 47110, 47700,

---

[35] The sample of "Mole Man" before the court has purple hair which this opinion does not consider. In the pictures of "Mole Man" on the packaging of other figures, the figure appears to support brown hair. It would be flatly arbitrary to hinge the classification of "Mole Man" on which sample the court (or Customs) had before it and what hair color such a sample would have.

47710, and 47720. They are similar to "X-Men" figures in that they are made of plastic, poseable, and five- or ten-inches tall. At issue are essentially four figures, "Hobgoblin," "Dr. Octopus," "Kingpin," and "Kraven."[36] Two of the figures are humanoid with at least one feature that prevents them from being representations of normal humans. The figure of "Hobgoblin" has blood red eyes with no pupils and features fangs and yellow skin. The "Dr. Octopus" figure has four tentacles coming from its back. Both Hobgoblin and Dr. Octopus have supernatural powers. The other two figures are more difficult to classify. The figure of "Kingpin" resembles a man in a suit carrying a staff. Nothing in the storyline indicates that Kingpin possesses superhuman powers. Yet, Kingpin is known to have exceedingly great strength (however "naturally" achieved) and the figure itself has a large and stout body with a disproportionately small head and disproportionately large hands. As it is, the figure is designed to communicate the legendary and freakish nature of the character. Even though "dolls" can be caricatures of human beings, the court is of the opinion that the freakishness of the figure's appearance coupled with the fabled "Spider-Man" storyline to which it belongs does not warrant a finding that the figure represents a human being. The last figure in the "Spider Man" line is "Kraven." According to its packaging, Kraven is the "last of a dynasty of Russian aristocrats" and "trained himself to be the greatest hunter on Earth." He uses "secret jungle potions" to "augment[] his strength and stamina." The character's strength and extreme ability to hunt are reflected in the figure's highly exaggerated muscle tone in arms and legs, its lion's-mane like vest, studded belt, and the spear

---

[36] The court does not have before it the sample of "Dr. Octopus" and the ten-inch versions of the figures. Instead, the court has "Dr. Octopus Projector" and the five-inch versions of the other three, which are sufficient to evaluate the figures.

that is included in the packaging. "Kraven" is the representation of a mythical or legendary creature more properly belonging to the list of robots, monsters, angels, and devils (which have been expanded by Customs to include trolls),[37] rather than being a representation of an ordinary human being. *See* 9503.49.00, HTSUS; Explanatory Note 95.03, HTSUS. Consequently, the court finds that all of the four "Spider-Man" figures before it are properly classifiable as "toys representing animals or non-human creatures (for example, robots and monsters)."[38]

With respect to the trading cards included in the packaging of a number of figures, the court agrees with Toy Biz that they are classifiable as "accessories" of the figures within the meaning of HTSUS 9503.49.[39] "[N]either the HTSUS nor its legislative history defines 'accessory.'" *Rollerblade, Inc. v. United States*, 24 CIT __, __, 116 F. Supp. 2d 1247, 1252 (2000). "When a tariff term is not defined in either the HTSUS or its legislative history, the term's correct meaning is its common meaning." *Mita Copystar Am. v. United States*, 21 F.3d 1079, 1082 (Fed. Cir. 1994) (citation omitted). To determine the common meaning of a tariff

---

[37] *See* HQ 089895 (Nov. 4, 1991). *But see* DD 897488 (May 31, 1994) (Customs classifying a stuffed elf figure with "large eyes, *pointed* ears, a bulbous nose, puffy cheeks and a painted-on smile" as a "doll" under HTSUS 9502) (emphasis added). The court notes that in the latter case, Customs "explained" its position by stating that "elves are not non-human creatures, as defined, and thus not excluded from the doll provision." *Id.* It is not clear how Customs reconciled classifying trolls as "other toys" and elves as "dolls."

[38] *See also* HQ 957803 (Feb. 2, 1996) (Customs classifying the actual "Spiderman" figure as "other toy" on the basis that "[t]he head of the figure is clearly non-human in appearance" covered with the well-known mask of "Spiderman").

[39] Customs classified the trading cards under HTSUS (1994) subheading 4911.99-6000 as "Other printed matter, including printed pictures and photographs: Other: Other: Other: Printed on paper in whole or in part by a lithographic process," dutiable at 0.4% *ad valorem*. *See* HQ 957636 (Oct. 11, 1995); HQ 957688 (Oct. 11, 1995); HQ 957603 (Oct. 12, 1995); HQ 958039 (Mar. 8, 1996).

term, a "court may rely upon its own understanding of terms used, and may consult standard lexicographic and scientific authorities." *Id.* (citation omitted). The noun "accessory" is defined as "'a thing of secondary or subordinate importance,'" *Toy Biz III* at 1302 (citing *Merriam Webster's Collegiate Dictionary* 7 (10th ed. 1997)), or "something contributing in a subordinate degree to a general result or effect; an adjunct, or accompaniment," 1 OED at 74. Customs interprets the term "accessory" according to its common meaning and further notes that "an accessory . . . , in addition to being an article related to a primary article, is used solely or principally with that article." *See, e.g.*, HQ 958924 (June 20, 1996). Moreover, even though "an accessory is not necessary to enable the goods with which they are used to fulfill their intended function[, it], however, must contribute to the effectiveness of the principal article (e.g., facilitate the use or handling of the principal article, widen the range of its uses, or improve its operation)." *Id.*

Elsewhere, Customs rejected separate classification of certain "trading cards" included with a toy set, which was comprised of the trading cards, two toy figures, and a toy box called "environment." *See* HQ 958345 (Mar. 11, 1996). Instead, Customs found that the cards are properly classifiable as "simple accessories," which are allowed to be included in a toy set per Explanatory Notes. *See id.* In that case, the cards were depicting at least one figure contained in the set. *Id.* Customs, on the other hand, thought a separate classification of the trading cards was appropriate in the case of "X-Men" because "[a]lthough the trading cards picture and describe the powers of individual action figures, each card has no connection to the figure with which it is packaged." HQ 958039 (Mar. 8, 1996). This court finds the distinction legally insignificant. Each trading card here may not be related to that figure, but it does picture and

describe a figure in the same series and is thus related to the series. The trading cards here serve

the function of linking the figures in the series and, therefore, enhance the play value and use of

the figures. Even though the trading cards may also be used for collecting and trading, their

inclusion with the figures indicates that those are not their principal use. The inclusion of the

trading cards provides additional incentive to purchase the package. Moreover, if separate

classification of printed materials that generally accompany toys were encouraged in every case,

that may lead to absurd results; for example, the classification of an instruction manual included

with a toy item as separate "printed matter."[40] The 9503 "other toys" (and the 9502 "dolls")

provision of the HTSUS is sufficiently broad (by virtue of including "accessories" of the articles)

to also allow the inclusion of the trading cards at issue here.

Finally, the only non-action figure item before the court, "Jumpsie,"[41] assortments 33200

---

[40] While Customs may separately classify an instruction manual which will be "repackaged" in another country with a pager cradle, a transformer, and recorded media, *see* NY E89772 (Nov. 26, 1999); when the instruction manual is already "packaged for retail sale," it is properly classifiable as an "accessory" (to certain computer equipment), *see* HQ 089180 (Aug. 2, 1991).

[41] Customs described the item as:

The "Jumpsie" doll *set*, identified by item nos. 33200 or 33201, is composed of a doll (not stuffed), two small pom-poms (for the doll), a small styling comb (for the doll), and a toy trampoline. Assembly of the toy trampoline involves snapping together a round plastic frame, and attaching (by 16 rubber bands) a plastic-coated textile mat measuring approximately 10-1/2 inches in diameter. The doll measures approximately 10-1/2 inches in height and has a battery compartment for 2 "AA" batteries (not included). When placed on the toy trampoline and switched on, the doll appears to jump on its own. When imported, the retail package is suitable for direct sale without repacking.

HQ 957688 (Oct. 11, 1995) (emphasis added).

or 33201, is properly classifiable as a "doll" under HTSUS subheading 9502.10.40, as classified

by Customs.[42]  The parties agree that "Jumpsie" consists of a doll representing a girl child and a

toy trampoline with other accessories, such as a toy comb for the doll, included.  The doll has the

ability to "jump" on the trampoline when a built-in mechanism in the doll is activated.  Toy Biz

argues that Jumpsie is classifiable as a "toy set" under HTSUS 9503.70.80, primarily by virtue of

the inclusion of the trampoline.[43]  *See Pl.'s Br.* at 17.  Toy Biz points out that Customs described

the item as a "set" and then resorted to "essential character" analysis under GRI 3(b), HTSUS, to

classify the item as a "doll."  *See id.* at 18.  GRI 3(b) provides in pertinent part that:

> [m]ixtures, composite goods consisting of different materials or made up of
> different components, and goods put up in sets for retail sale, which cannot be
> classified by reference to 3(a), shall be classified as if they consisted of the
> material or component which gives them their *essential character*, insofar as this
> criterion is applicable.
> (emphasis added)

GRI 3(a) provides in pertinent part that:

> when two or more headings each refer to part only of the materials or substances
> contained in mixed or composite goods or to part only of the items in a set put up
> for retail sale, those headings are to be regarded as equally specific in relation to
> those goods, even if one of them gives a more complete or precise description of
> the goods.

In classifying "Jumpsie" as a doll, Customs reasoned that the item met the criteria for a "set"

specified in Explanatory Note X to GRI 3(b),[44] but pursuant to Explanatory Note VIII to GRI

---

[42] HTSUS subheading 9502.10.40 reads: "Dolls representing only human beings and parts and accessories thereof: Dolls, whether or not dressed: Other: Not over 33 cm in height."

[43] HTSUS subheading 9503.70.80 reads: "Other toys, put up in sets or outfits, and parts and accessories thereof: Other: Other."

[44] Explanatory Note X to GRI 3(b) provides that for purposes of this rule, the term "goods put up in sets for retail sale" means goods that:

3(b), the item's "doll" component lent its "essential character" to the item by being of "greatest bulk, weight, and value." HQ 957688 (Oct. 11, 1995); Explanatory Note VIII to GRI 3(b) (providing that for essential character analysis the item's "bulk, quantity, weight or value" is a factor). Customs also explained that while "the doll's 'jumping' ability would be adversely affected by the toy trampoline's absence, . . .[w]ithout the toy trampoline, the article would remain a doll (capable of at least some movement) and its accessories." HQ 957688 (Oct. 11, 1995). Customs' reasoning is persuasive; the "doll" component lends the item "Jumpsie" its "essential character." While the doll would still have value as a plaything without the trampoline, the trampoline would not have the same value without the doll. The toy trampoline is merely an accessory that enhances playing with the doll. *Cf. Toy Biz III* at 1302 ("A standard dictionary definition of 'accessory' is 'a thing of secondary or subordinate importance.'") (citing *Merriam Webster's Collegiate Dictionary* 7 (10th ed.1997)); 1 OED at 74 (defining "accessory" as "something contributing in a subordinate degree to a general result or effect; an adjunct, or accompaniment"). Customs may describe a toy article as a "set" and still reject the "toy set" classification under HTSUS 9503.70.80. Consistent with the court's earlier observations about the "toy set" provision of the HTSUS, no component of a "toy set" should dominate over another. Here, the "doll" component of the article clearly dominates (in terms of the place it has

---

(a) consist of at least two different articles which are, *prima facie*, classifiable in different headings . . . ;
(b) consist of products or articles put up together to meet a particular need or carry out a specific activity; and
(c) are put up in a manner suitable for sale directly to users without repacking (e.g., in boxes or cases or on boards).

in the set) over the non-doll items in the set, such as the trampoline.

## IV. CONCLUSION

For all the foregoing reasons, Plaintiff's motion for summary judgment with respect to action figures (alternately referred to as "X-Men," "X-Force," "X-Men Projectors," "X-Men Steel Mutants," "Spider-Man," and "Fantastic Four") is granted and Defendant's cross-motion is denied. Plaintiff's motion for summary judgment with respect to trading cards is granted and Defendant's cross-motion is denied. Plaintiff's motion for summary judgment with respect to the item "Jumpsie" is denied and Defendant's cross-motion is granted.

A separate judgment will be entered accordingly.

_____
Judith M. Barzilay
Judge

Decided: January     , 2003
          New York, New York